# EXHIBIT B

6/20/2025 Trial Transcript (Excerpts)

1              UNITED STATES DISTRICT COURT

2             EASTERN DISTRICT OF CALIFORNIA

3                      --oOo--

4   UNITED STATES OF AMERICA,    ) Case No. 2:22-CR-00068-DJC-1
                                 )
5                                ) Sacramento, California
                  Government,    ) June 20, 2025, 8:06 a.m.
6          v.                    )
                                 )
7   SUNEET SINGAL,               ) Re: Trial Day 4
                                 )
8               Defendant.       )

9

                    TRANSCRIPT OF PROCEEDINGS
10        BEFORE THE HONORABLE DANIEL J. CALABRETTA
                UNITED STATES DISTRICT JUDGE
11
    APPEARANCES:
12  For the Government:     U.S. DEPARTMENT OF JUSTICE by
                           MR. NICHOLAS M. FOGG,
13                         ASSISTANT U.S. ATTORNEY
                           MS. JESSICA LOUISE DELANEY,
14                         ASSISTANT U.S. ATTORNEY
                           501 I Street, Suite 10-100
15                         Sacramento, California  95814

16  For the Defendant:     STRADLEY, RONAN, STEVENS & YOUNG by
                           MR. MICHAEL J. ENGLE
17                         2005 Market Street
                           One Commerce Square, Suite 2600
18                         Philadelphia, Pennsylvania  19103

19                         WILLIAM J. PORTANOVA, ATTORNEY AT LAW
                           MR. WILLIAM JOHN PORTANOVA
20                         400 Capitol Mall, Suite 1100
                           Sacramento, California  95814
21
                     MARYANN VALENOTI, RMR, CRR
22                      Official Court Reporter
                        501 I Street, Suite 4-200
23                      Sacramento, CA 95814
                      mvalenotiRMRCRR@gmail.com
24                       (916)930-4275

25  Proceedings reported via mechanical steno - transcript produced
    via computer-aided transcription

1   guaranty went to, specific intent and good faith.  So based on

2   that representation alone, I think it's appropriate to give the

3   entirety of the instruction which has been approved by the

4   Ninth Circuit and other courts.

5           While Mr. Prasad was not a direct victim of the wire

6   fraud counts, he does still qualify as a victim under the

7   United States Code as he was harmed by the conduct in this

8   case, so I'll note that.

9           Our bigger concern is the personal guaranty and that

10  there will be an argument that the personal guaranty showed his

11  good faith, and the instruction specifically says that the

12  harm, the economic loss is not a defense.

13          THE COURT:  I mean, I will say looking at the

14  commentary in 4.13, the instruction you asked for is the first

15  part of an instruction, and the government's asking for the

16  second part of that instruction.  I mean, it seems like if I

17  give one, I should give the whole thing.

18          MR. PORTANOVA:  If that's the Court's position, that's

19  fine.  I don't believe it will substantively affect us as to

20  the arguments being presented at closing.

21          THE COURT:  I think to give it a complete instruction,

22  then I will include that language.

23          So let's talk about the contracts.  I'll be honest,

24  I'm really on the fence about it.  I think in general, I think

25  the cases that the government cited are pretty readily

1    distinguishable in my mind.  Take the abortion case, for
2    instance, the contract was maybe part of it, but really what
3    the case was about is you made this promise you had no intent
4    on keeping, the contract is somewhat irrelevant.  I can't
5    remember the facts.  It's an out-of-circuit case you cited, but
6    it also seemed like it was a bit farther afield.  Here, if the
7    contract in fact had been completed, then the defendant was no
8    longer legally the owner, and, therefore -- sorry, the contract
9    had not been completed, he was still the owner, therefore, as a
10   matter of law, no fraud.  So, I think that goes much more to
11   the heart of the case, the defense's case, than in the case of
12   the government's side.  That's Point 1.
13           The countervailing point is I think the evidence I
14   have at this point is that both parties to the contract said
15   they didn't think they were bound by the conditions precedent
16   in 2.2.2.  I think the only evidence is the language of the
17   contract, but I think both Mr. Prasad on the stand and the
18   defendant in the SEC testimony that has been introduced said,
19   We didn't think we had to comply with those.  And then the
20   conduct of the parties immediately after that was consistent
21   with the contract being completed since you then had the loan
22   going from BDC the very next day.  I just don't know at this
23   point that there's sufficient evidence to support that
24   particular defense theory.  So I'll let you be heard on that.
25           MR. PORTANOVA:  Yes, Your Honor.  As a matter of law,

1    this contract falls under common law statute of frauds as

2    enshrined in California Civil Code 1624.  It's a contract

3    lasting longer than a year for a value of greater than a

4    hundred thousand dollars.  It concerns the assignment of leases

5    pursuant to the contract.  Pursuant to California law, any

6    contract that is under the relevant provisions of 1624 can only

7    be modified by another written instrument.

8         THE COURT:  If that's your argument, I need that in

9    full briefing in a motion, that's going to be a post-trial

10   thing.  Because if you're right, as a matter of law, I think

11   that a complete and absolute defense, but that's the first time

12   I think I'm really hearing that specific argument and that is

13   well beyond what we're going to ask the jury to do.  It's

14   almost irrelevant, because if you're right, I think we're done

15   here.

16        MS. DELANEY:  Your Honor, that's the first I have

17   heard this argument.  We certainly haven't briefed whether it's

18   a matter of law this Court is finding a contract or not.  I'm

19   not sure that I am equipped right now to respond.

20        THE COURT:  I'm not either.

21        MR. ENGLE:  Your Honor, may I point out one other

22   issue about something that actually is in evidence?

23        Given that Government 101 is in evidence, the whole

24   contract --

25        THE COURT:  Right.

1      MR. ENGLE:  -- the contract itself says that you can't

2  waive a provision or amend it unless it's in writing,

3  consistent with the statute of frauds.

4      Section 9.8 says, "Amendments and waivers.  No term or

5  provision of this agreement may be amended, waived, discharged,

6  or terminated orally, but only by an instrument in writing

7  signed by the party against whom the enforcement of such

8  amendment, waiver, discharge, or termination is sought."

9      So the contract itself, it's already in evidence,

10  contemplates the fact that what Mr. Prasad said and what he

11  testified to in 2018 is just flatout wrong.  That's not

12  accurate.  You can't do that, and the contract said they

13  couldn't do that, and the California section that Mr. Portanova

14  just cited is the reason why that provision is in the contract,

15  it would have to be in order to comply with California contract

16  law.  I say that as the Pennsylvania lawyer in the courtroom.

17      MR. PORTANOVA:  Your Honor, lest anybody get confused

18  that we're trying to at the last minute change a theory, it was

19  only after reading the government's antagonism towards the

20  contract instructions that I went back to contract basics and

21  started looking at this because the --

22      THE COURT:  I'm not worried about -- it's not a

23  waiver, it's a criminal case.  Either you're right or you're

24  not, but I don't think it's fair for the government or me to be

25  kind of substantively engaging in this very specific legal

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1  argument at this point.

2          So, I think, fortunately, we're not instructing the

3  jury today.

4          Is the defense still intending on presenting a case

5  today?

6          MR. ENGLE:  We are, Your Honor.

7          THE COURT:  I think what I'm going to say is I need

8  this all in writing.  This needs to be fully briefed, and, you

9  know, with an opportunity for the government to respond, you

10  know.  My gut is that this is a legal issue for the Court to

11  resolve and not really a jury question anyway.

12          I mean, I think there's kind of two different related

13  theories that I think the defense could have here.  One is that

14  regardless of whether the parties actually successfully

15  modified the contract, the defendant in good faith could have

16  felt that the contract hadn't been completed and in his mind he

17  was still the owner, right.  I think that's covered by the good

18  faith instruction.  That's not a legal issue.  That's a factual

19  one for the jury to decide.

20          The second theory is that as a matter of law the

21  contract had not been complied with.  He was legally still the

22  owner, and, therefore, there was no fraud.  I think that's a

23  Court issue to decide.  So I wonder, and this is -- you know, I

24  want briefing on this, so I'm kind of talking out loud, or

25  thinking out loud rather, if the contract issue is just

Singal - Direct by Portanova

1   a better pastry in the morning for my drivers when they would

2   head out.  So I applied for a Cinnabon franchise lease simply

3   to put in those pastries into the restaurant -- into the gas

4   station itself.

5   Q    At some point you began to acquire more Cinnabons.  Could

6   you tell us about that?

7   A    Yes.  So, in -- when I sent my application in to get that

8   license for the Central Valley, the CEO of Cinnabon called me

9   and said, Your resume doesn't typically look like a lot of our

10  food operators.  Would you come into our headquarters and take

11  a look at our business and see how we could maybe do something

12  together?

13       So I flew out there.  They had a mall, Sun Valley Mall in

14  Concord at the time that essentially had gone out of business.

15       In the Cinnabon business, in the holiday season you do 40

16  to 60 percent of your sales in Thanksgiving and Christmas time.

17  You could imagine you can't eat a 1400-calorie Cinnabon

18  everyday.

19            MS. DELANEY:  Objection, narrative.

20            THE COURT:  Sustained.

21  BY MR. PORTANOVA:

22  Q    Thank you.  I'll ask more questions that are pointed for

23  you.

24  A    Okay.

25  Q    That was on me, Mr. Singal.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Singal - Direct by Portanova

1    A    No worries.

2    Q    So, in what year did you acquire the Cinnabon franchise?

3    A    So the Cinnaworks portfolio originally was somewhere

4    between 2014 and 2015.  It was a company called Cinnaworks --

5              MS. DELANEY:  Objection, nonresponsive.

6              THE COURT:  Sustained.  I think there was an answer

7    there, but I think now we're going beyond the question.

8    BY MR. PORTANOVA:

9    Q    I'll help give some guidance.  The Court would prefer it

10   if you didn't kind of just move into the story as much as I ask

11   questions.

12   A    Okay.

13   Q    Okay.  So what year -- how were the portfolio of Cinnabons

14   that you ultimately acquired held?

15   A    So, I put down my own cash to buy the business, and I took

16   out a bank loan to buy a company called Cinnaworks.

17   Q    And at some point did those Cinnaworks properties become

18   part of FC Retail?

19   A    Yes, originally those businesses were owned by First

20   Capital Real Estate Investments, and the Sun Valley store was

21   owned by separate company called I think Cinnabon Sun Valley

22   14.

23   Q    What year was that acquisition or the transfer of the

24   properties into FC Retail; what year did that take pleas?

25   A    At some point in 2015 we formed a company called First

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Singal - Direct by Portanova

1   Capital Retail, which was a wholly-owned subsidiary of the

2   company and the Cinnabons itself, 15 of them were transferred

3   into that store.

4   Q    How did Ramesh Prasad come into your life?

5   A    Ramesh was introduced to me prior to the Cinnabon

6   acquisition as a mutual title rep friend in town.  He had a

7   land development in Elk Grove, California, and he was

8   seeking -- at the time I had a land development company, and he

9   was seeking someone to partner up with him on that, so that's

10  how we originally met.

11  Q    And at some point did he become an employee of FC Retail?

12  A    Yes.  So, originally during the course of meeting --

13          MS. DELANEY:  Objection, nonresponsive.

14          THE COURT:  Overruled.  You could go ahead.

15          THE WITNESS:  At some point in the course of meeting

16  Ramesh, he had shared with me he had a quick-service food

17  background, and when I was offered the opportunity to buy the

18  Cinnabon portfolio, I asked him to be a consultant to conduct

19  due diligence on the company, and then after I acquired the

20  company, then I hired him as an employee at some point later

21  thereafter.

22  BY MR. PORTANOVA:

23  Q    What was his position with the company?

24  A    Originally it was some kind of manager position to kind of

25  oversee running the operations of the business on a day-to-day

Singal - Direct by Portanova

1   basis, and then later on moved him up to a role where he went

2   by president.

3   Q    And what did he essentially do day to day for the company?

4   A    Day to day was managing regional managers and store

5   managers that ran every single store across Sacramento down to

6   Southern California, and then usually my interaction with him

7   was weekly or monthly in terms of more like reporting, that

8   type of thing.

9   Q    How was Mr. Prasad paid?

10  A    Mr. Prasad was paid a salary through my payroll company,

11  which we went by First Capital Management.  We used I think a

12  company called I think ADP Payroll Services at the time for

13  those employees, including Ramesh.

14  Q    Were you happy with your investment in the Cinnabons?

15  A    Yeah, it was a very successful investment.  The stores

16  did -- just going off memory -- I think 10 to 20 million a year

17  in revenue, had healthy earnings.  It was just -- it was just a

18  more difficult business to run kind of in terms of cash flow

19  because you did the majority of your revenue between

20  Thanksgiving and Christmas.  You did the other revenues during

21  kind of special holidays during the year like Valentine's day,

22  mother's day, again, because you can't eat a 1400-calorie

23  Cinnabon everyday.

24  Q    Of course.  What are merchant cash advances?

25  A    Merchant cash advances are very common in the restaurant

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Singal - Direct by Portanova

1  business where you will sell some of your future revenues in
2  exchange for capital today.  I took out those loans very
3  commonly for many years from acquisition from all the way on.
4  Q    What use did the merchant cash advances serve for your
5  business?
6  A    They held cash flow of the business during the slow
7  season.  When you had slow season you would take out these
8  loans, and when you had your busy seasons you pay them off.  We
9  do that routinely and had no issues with them.
10 Q    Did you ever default on any of these merchant cash
11 advances prior to Ramesh taking over?
12 A    No, actually Ramesh was our first default situation we
13 ever had to.
14 Q    Given the success of the Cinnabon business, why did you
15 ultimately decide to try to sell it into the BDC?
16 A    Yes.  So, in 2017 there was a lot of expansion and
17 conversations happening with Cinnabon.  So at one point we were
18 negotiating buying Baja Fresh, the entire company, Jimboys,
19 several other franchises as well, and it was determined that at
20 some point that business would need to become a standalone
21 business outside of the purview of just being captive in-house,
22 that's how that conversation originally came about.
23 Q    We've kind of called it by a couple of different names.
24 There's two entities, so for clarity, when we talked about the
25 BDC, we're talking about Freedom Capital or First Capital; what

Singal - Direct by Portanova

1  are we talking about?

2  A    So, there was a company referred to as the BDC, and

3  originally it was called Freedom Capital Investment Corp., and

4  subsequently the name was changed to First Capital Investment

5  Corporation.

6  Q    So who originated the idea of selling the First Capital

7  Retail business into the BDC?

8  A    It was actually originated by the investors of the BDC, so

9  they -- the BDC is a public company that essentially would sell

10  shares to investors, so those investors were looking for a

11  dividend product at the time, and it was determined that the

12  First Capital Retail business could provide that dividend.

13  Q    When roughly was that?

14  A    That was in 2017.  I think I met Jeffrey McClure, who was

15  the CEO of Freedom Capital, in 2016 at a conference, and then

16  we had different conversations at the time.  Then it evolved --

17  eventually it resulted in me acquiring or First Capital

18  acquiring his BDC investment adviser.

19  Q    What happened with the initial plan to sell First Capital

20  Retail into the BDC?

21  A    Yeah.  So, originally the plan was for the BDC to write

22  financing instruments to First Capital Real Estate Investments.

23  At that point it was a little out of my hands.  The BDC is a

24  very complicated set of rules under the 40 Act.  So I hired

25  lawyers that were kind of best in class under the 40 Act to go

Singal - Direct by Portanova

1   out there and provide guidance, and it was determined from that

2   guidance that there would be some what's called the affiliate

3   issues or something of that nature, so that's how originally it

4   was structured.

5   Q    And what was your understanding of what the affiliate

6   issue was for the sale?

7   A    Quite frankly, it was beyond me.  It was really a legal

8   issue.  There was a lot of different definitions as to what

9   could or could not be an affiliate.

10  Q    So did you guys come up with the new plan following this

11  issue?

12  A    We did.  So the plan then was to go ahead and write

13  financing to First Capital Retail, the business.

14  Q    And who was involved in the new structure of the sale?

15  A    So the lawyers actually -- at that point I had hired quite

16  a few lawyers to kind of work on this and tell me what was the

17  way to structure this correctly.  So the BDC itself had its own

18  lawyers, which were big national firms, Morris, Manning;

19  Austin, Berg, and then my counsel was run by the firm in

20  Sacramento called Downey Brand with the lead partner Tony

21  Arostegui.  The other person at that point we hired was

22  Ramesh's son, who had just passed the bar exam and became an

23  associate to work under him.  So Ramesh's son Ryan and Tony

24  worked on drafting documents on this side, and the BDC counsel

25  worked on the BDC side.

Singal - Direct by Portanova

1   Q    Was one of those documents the Membership Interest

2   Purchase Agreement that we've seen presented in court?

3   A    That's correct.

4        MR. PORTANOVA:  Would you mind pulling up Government

5   Exhibit 101?

6   BY MR. PORTANOVA:

7   Q    You know what this document is, correct, Mr. Singal?

8   A    I do, yes.

9   Q    What is it in your understanding?

10  A    So, these are conditions, contractual conditions to close

11  an agreement.  So, as part of the transaction between the BDC

12  and First Capital Retail, a document was created to essentially

13  begin the process of selling the business from First Capital

14  Real Estate Investments to Mr. Prasad, and these are the

15  closing conditions that were outlined to be delivered in order

16  to satisfy that agreement.

17  Q    Was it your understanding that February 23 was to be the

18  original closing date?

19  A    Originally I was traveling quite a bit.  So I don't even

20  think I was there, but the lawyers were all talking and they

21  were looking at original date of February 23.

22  Q    So these four conditions, were there additional conditions

23  in your understanding required to close for Ramesh Prasad to

24  perform?

25  A    From my understanding, absolutely.  I was on the leases

Singal - Direct by Portanova

1  for all the landlords, I was on the franchise applications, all

2  the vendor bills, the payroll was my responsibility.  So

3  typically if you buy a business, my understanding was you take

4  over all the things that go with that business and none of

5  those things had taken place.

6  Q    Was it your understanding that these documents were to

7  effectuate that transfer?

8  A    Yes.  My understanding, the most important one being

9  consideration, like, I wouldn't sell my business for free, and,

10  so, looking for the note, along with pledge and security to

11  having various, you know, interests and guarantees since I

12  wasn't receiving cash up front.

13  Q    Did you meet with Mr. Prasad in person on the 23rd of

14  2017, February?

15  A    I did not.

16  Q    How did you come to understand that he had signed this

17  document?

18  A    I got notified there was a big chain of e-mail

19  communication going around with lawyers at the time.  I was

20  traveling quite a bit at the time, so they had all come up with

21  agreements of various sorts and they were being delivered to

22  me.

23  Q    In light of provision 2.2.2, were you expecting Mr. Prasad

24  to deliver it to you at closing?

25  A    Exactly the items that are listed here, the Promissory

Singal - Direct by Portanova

1   Note, the Pledge Agreement, the Security Agreement, the Company

2   Agreement.

3   Q    And what did you, in fact, come to learn that Mr. Prasad

4   had provided on February 23?

5   A    He hadn't provided anything.  In fact, he was dragging his

6   feet for many months thereafter, actually reluctant to deliver

7   any documents.

8   Q    So when you received the executed Membership Interest

9   Purchase Agreement without the closing documents, in your view

10   had the transaction closed?

11   A    No, all we had simply done at that point was entered into

12   an agreement to sell the business at some later date, but at

13   that point all the liabilities of the business were still mine,

14   payroll responsibilities were mine, landlord lease obligations

15   were mine, franchise dues were mine.  So at that point nothing

16   had really changed other than you, like, selling a house, where

17   you entered into an agreement to sell a house, but I hadn't

18   been paid for my house yet.

19   Q    What steps did you take thereafter to affect the actual

20   close?

21   A    I started contacting Mr. Prasad trying to Chase down

22   documents saying, Hey, I need these documents.  The pressure

23   really went up a notch when the auditors for the BDC were

24   saying that they could not recognize the sale because there

25   were no documents, and so I started contacting Mr. Prasad quite

Singal - Direct by Portanova

1   a bit during the month of June specifically, that's when --

2   because June 30's the end of the second quarter and that's when

3   these things were really going to be needed.  So I started

4   upping the pressure on delivering them, that was about it.

5   Q    During this period that Mr. Prasad had failed to provide

6   the documents required by the closing obligations, did anything

7   about your operation of the businesses change at all?

8   A    Yeah, nothing had changed.  Good hard working people with

9   Cindy and Windy that were running the business day to day,

10  making the payrolls.  It was business as usual with merchant

11  cash advances, slow season of the business, same patterns of

12  what we had operated for many years prior to that point.

13  Q    Did you observe any changes in the behavior of Mr. Prasad

14  during this period that he had not delivered the closing

15  documents?

16  A    No.  In fact, as late as July, early July, I believe of

17  2017, he was asking me for a pay raise, which I thought was --

18  which was also part of why the bankruptcy in September, it

19  caused by surprise because the business was so distressed, I

20  don't think I would be asking for a pay raise two months before

21  that.

22  Q    Allow me to divert back a second, I need to go back in

23  time.  Do you recall FCR receiving a loan from the BDC

24  immediately after this document was executed?

25  A    Yeah, I believe February 24 there was a loan extended from

Singal - Direct by Portanova

1   the BDC to First Capital Retail.

2   Q    Why did you not consider this to be an affiliate issue, as

3   you've discussed before, given that Ramesh had not -- or Mr.

4   Prasad had not provided the closing documents required?

5   A    No, so one is I'm not a lawyer, that's why I hired many

6   lawyers who were experts at this time, and they provided

7   documents saying that on the face of the document February 23,

8   that that allowed their BDC loan to be in compliance the next

9   day.  So I defer to that guidance.

10  Q    And the fact that it hadn't closed didn't present any

11  legal issue from your understanding?

12  A    Yeah, no, from the lawyer's advice to myself at the time,

13  if a deal closed later on that was not --

14          MS. DELANEY:  Objection, hearsay.

15          THE COURT:  Overruled.  I'll instruct the jury that

16  you are not to consider it for the truth of what the lawyers

17  told him, but you can consider it for the witness's

18  understanding of what was told.

19          MR. PORTANOVA:  Thank you, Your Honor.

20  BY MR. PORTANOVA:

21  Q    Let's turn back to the sale of FCR.  So you had mentioned

22  pressure from the BDC regarding an audit.  Can you go into that

23  a little bit?

24  A    Yeah, so in order for the BDC to recognize the

25  transaction, the actual sale would have had to take place

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Singal - Direct by Portanova

1  whereby there would have been some separation of interests at

2  that point.  Because the document, the contract had not been

3  satisfied, it was not viewed as a sale having taken place.  So

4  in June the pressure was very high because we need an audit,

5  and if the audit did not pass, then they would mark the

6  investment as a zero value investment because it's not a valid

7  loan.

8  Q    Actually, first of all, when approximately was that?

9  A    This is all now in the June 2017 time frame.

10 Q    Okay.  So what steps did you take under that pressure to

11 make sure that the sale closed?

12 A    So I started reaching out to the BDC team to make sure

13 these documents were, in fact, completed.  I think it was

14 June 6, 2017 that an e-mail came out from the BDC and Ramesh's

15 son Ryan that even introduced the draft version of these

16 documents the first time.

17         MS. DELANEY:  Objection, hearsay.

18         THE COURT:  Overruled.

19 BY MR. PORTANOVA:

20 Q    So that day is rather specific.  How do you remember that

21 date specifically?

22 A    During the course of being indicted having to go through

23 e-mails, I've had to go review these things, and I was able to

24 review that e-mail.

25 Q    Give me one second, Mr. Singal.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Singal - Direct by Portanova

1    THE COURT:  What exhibit is it?

2    MR. PORTANOVA:  CV, Defense Exhibit CV.

3    BY MR. PORTANOVA:

4    Q    Did you have an opportunity to review it, Mr. Singal?

5    A    I have.

6    Q    Do you recognize it?

7    A    Yeah, this is the e-mail I think I'm referring to there.

8    Q    Okay.  Do you know all the parties on the e-mail?

9    A    Yes.  Ryan Lochan, that was Ramesh's son who was an

10   attorney working at the time working with our general counsel.

11   Connor Prochaska was the rep for the BDC company at the time.

12   Copied on that e-mail is Tony Arostegui at Downey Brand who was

13   my lawyer, Ramesh Prasad, and myself.

14   Q    This was the typical manner in which you guys communicated

15   via e-mail in your line of business?

16   A    Yeah.  E-mail was very common practice for communicating.

17   Q    And you had a system for retaining these e-mails for any

18   future purpose, be it litigation or whatever?

19   A    Yeah, there was some IT company in New York that housed

20   all the e-mails and servers.

21   Q    This document, in fact, was produced to the SEC as part of

22   a subpoena request later?

23   A    Yes.

24   MR. PORTANOVA:  Your Honor, I would move to admit this

25   as a business record.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Singal - Direct by Portanova

1          THE COURT:  Any objection?

2          MS. DELANEY:  No objection.

3          THE COURT:  Defendant's CV will be admitted.

4      (Defendant's Exhibit CV admitted in evidence.)

5  BY MR. PORTANOVA:

6  Q    So is this the document that you had been referring to?

7  A    Yes, correct.

8  Q    And what was your understanding of what this e-mail from

9  Ryan Lochan signified?

10  A    This e-mail signified draft version of the documents

11  needed to close the original Puchase and Sale Agreement that we

12  referred to in the prior exhibit.

13  Q    Were you surprised that the documents were only being

14  finalized on June 6?

15  A    Yeah.  I think this was a draft version so I don't

16  remember if it was final draft, but I was surprised that we

17  were many months later after February 23 to even getting a

18  version of these documents.

19  Q    Do you know when Mr. Prasad ultimately provided executed

20  copies of these and fulfilled his closing conditions?

21  A    I don't recall exactly, but I think it was sometime in

22  July, but I know that in early July I believe he was still

23  asking me for a pay raise, and I don't think he would be doing

24  that if he had bought the business.

25          MS. DELANEY:  Objection, speculation as to the last

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Singal - Direct by Portanova

1  part only, Your Honor.

2          THE COURT:  Sustained.  I'll order the jury to

3  disregard what he believed Mr. Prasad thought.

4          MR. PORTANOVA:  Thank you, Your Honor.

5  BY MR. PORTANOVA:

6  Q    After the sale had closed, whether it be, you know, mid

7  July or whenever it was, what steps did you take to separate

8  your business?

9  A    After in the summer of 2017, Ramesh finally started

10 leaving our offices in Gold River where it was my headquarters.

11 He also started removing the employees from the ADP payroll

12 company at First Capital Management to his own.  So he started

13 to finally demonstrate steps of taking control of the business

14 in summer of 2017.

15 Q    Thank you.  So I'm going to fast forward a little bit here

16 from July of 2017.  So the jury, as you are aware, heard a

17 variety of audio clips pulled from testimony given in the SEC

18 enforcement action and investigation.  Do you remember those

19 clips?

20 A    I do.

21 Q    So what's going on here; when did you first become aware

22 that there was an SEC investigation into certain regulatory

23 aspects of the FCR transaction?

24 A    After Ramesh had filed bankruptcy in September, so two

25 months after taking -- starting to take control of the

Singal - Direct by Portanova

1  business, out of nowhere he files for bankruptcy protection.

2          MS. DELANEY:  Objection, nonresponsive.

3          THE WITNESS:  And --

4          THE COURT:  Hold on a second.  Overruled, you can

5  continue.

6          THE WITNESS:  And during that bankruptcy he made

7  certain claims that then made their way to the SEC and that's

8  when I first -- to answer your question, that's when I first

9  learned about the SEC matter.

10 BY MR. PORTANOVA:

11 Q    Okay.  What was that first contact from the SEC?

12 A    So the SEC sent a subpoena to my Gold River office

13 demanding documentation of the First Capital Retail

14 transaction.

15 Q    And at that time did you have an understanding of the

16 nature of the investigation?

17 A    Yes, the nature at the time --

18          MS. DELANEY:  Objection, necessarily calls for

19 hearsay, Your Honor.

20          THE COURT:  Overruled.  You could answer.

21          THE WITNESS:  At the time they were inquiring into

22 potential affiliate act violations of the 40 Act.

23 BY MR. PORTANOVA:

24 Q    How did the government's sudden interest in you make you

25 feel?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Singal - Direct by Portanova

1            MS. DELANEY:  Objection, relevance.

2            THE COURT:  If there is an objection, please let me

3    rule on the objection before you start answering, sometimes I

4    need to kind of read the transcript to get context.  So it may

5    take a second.

6            Overruled.  You can answer.

7            THE WITNESS:  Can you rephrase that?  I'm sorry.

8    BY MR. PORTANOVA:

9    Q    What was your response to knowing that you were within the

10   ambit of a SEC investigation?

11   A    Not good.  I was concerned that we had these affiliate

12   potential violations because the transaction had not closed so

13   much later than we originally thought it would.  So I went out

14   and hired counsel who dealt with the SEC as well as --

15           MS. DELANEY:  Objection, narrative.

16           MR. PORTANOVA:  That's fine, Your Honor.

17           THE COURT:  All right.

18   BY MR. PORTANOVA:

19   Q    What steps did you take based on this response to protect

20   yourself?

21   A    I just hired lawyers to go out there and investigate the

22   matter and what the -- I didn't know the 40 Act myself.  That's

23   why I deferred to lawyers to kind of guide me on that process.

24   Q    Okay.  Were there other parties involved in the

25   investigation to your knowledge?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Singal - Direct by Portanova

1    A    The subpoenas were pretty robust, I don't recall who

2    actually was in the subpoena request and all that.

3    Q    Safe to say a lot of lawyers?

4    A    A lot of lawyers, national firms that are specialized in

5    the 40 Act and SEC matters.

6    Q    Do you remember how many years the investigation was

7    pending?

8    A    The total investigation -- well, all I know is in 2018 I

9    had the deposition with the SEC, and in 2019 the SEC filed suit

10   against me saying I didn't have that business or I had that

11   business, which is a violation of the 40 Act.

12            MS. DELANEY:  Objection, Your Honor.  Actually, strike

13   that.  I withdraw the objection.

14            THE COURT:  Okay.

15   BY MR. PORTANOVA:

16   Q    How much did you rely on counsel and experts in SEC

17   matters during this time?

18   A    Almost a hundred percent.  As a business person that's why

19   you hire lawyers, to give you the guidance of these things that

20   are not something that I would specialize in, and I refer to

21   that guidance on how I transacted in all my transactions.

22   Q    What was their takeaway from looking at this transaction

23   with fresh eyes?

24            MS. DELANEY:  Objection, hearsay.

25            THE COURT:  Sustained.

Singal - Direct by Portanova

1  BY MR. PORTANOVA:

2  Q    In the course of your consultation with these various

3  experts and attorneys, did your understanding of the FCR

4  transaction begin to change?

5  A    Yeah.  My understanding in 2018 of the FCR transaction was

6  that based on guidance from counsel that was on the face of the

7  document on February 23, that we were compliant with the 40

8  Act, but that even though the transaction closed many months

9  later, that did not prevent that loan from happening.  However,

10 the SEC found differently on that because I'm having to pay

11 back that loan currently.

12             MS. DELANEY:  Objection, Your Honor.

13             THE COURT:  I'll have the jury disregard what the SEC

14 found.

15 BY MR. PORTANOVA:

16 Q    That's okay, Mr. Singal.

17            The question I think that's on everybody's mind here is

18 that the answers you've been giving this morning during our

19 examination here seem to directly contradict some of the

20 answers that you gave in the audio clips that were played for

21 the jury.  The question is what changed; why is something true

22 in 2017 and then totally different understanding of that

23 transaction in 2018?

24 A    Yeah, sure.  In 2017 you have to understand at that time I

25 own a business, I'm responsible for all the bills of that

Singal - Direct by Portanova

1    So, this merchant cash advance dated from April 18, 2017,

2    whose signature is on this document, Mr. Singal?

3    A    That's the stamped signature that was used in my office by

4    Ms. Campbell.

5    Q    And why did you allow your stamped signature to be used to

6    endorse this document?

7    A    Because I was the owner of the business.

8    Q    And likewise, this document, defense Exhibit FJ, do you

9    recognize the signature on this document?

10   A    Yeah, that is my stamped signature used by Ms. Campbell.

11   Q    And why did you allow that to be used on that document?

12   A    Because I was the owner of the business.

13   Q    Previously admitted as Government's Exhibit 212.  Is this

14   your signature, Mr. Singal?

15        MS. DELANEY:  Objection, Your Honor.  This is not the

16   proper exhibit.

17   BY MR. PORTANOVA:

18   Q    Is it safe to say -- don't worry about pulling up the

19   exhibits.

20        THE COURT:  Go ahead.

21   BY MR. PORTANOVA:

22   Q    Is it safe to say, Mr. Singal, that your signature appears

23   on each of the MCAs that are at issue in this case?

24   A    That's correct.

25   Q    And as the owner of FCR retail?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Singal - Direct by Portanova

1   A    As the owner, which I also personally guaranteed putting

2   my own personal assets --

3              MS. DELANEY:  Objection, nonresponsive.

4              THE COURT:  Sustained.

5   BY MR. PORTANOVA:

6   Q    Why did you allow either your signature to be affixed by

7   stamp or to sign yourself on each of these merchant contracts?

8   A    Because I was the owner of the business.

9   Q    Did each of those contracts have a collateral document, a

10  personal guaranty, and a Confession of Judgment?

11  A    It did.

12  Q    What was your understanding as to the impact of those two

13  documents?

14  A    As all the merchant lenders indicated the last couple

15  days, there was a personal guaranty with respect they could

16  bypass the civil litigation process, have a judgment against me

17  personally, and because I was the owner of the business and I

18  was comfortable with what the business performance was and

19  because I had a healthy balance sheet at the time, I had no

20  reason to be concerned about anything there, and I gave my own

21  guaranty for it.

22             MR. PORTANOVA:  No further questions.

23             THE COURT:  All right.  Thank you.  Any cross?

24             MS. DELANEY:  Yes, Your Honor.

25             THE COURT:  Hold on.  All right, go ahead.

Singal - Cross by Delaney

1                        CROSS-EXAMINATION

2      BY MS. DELANEY:

3      Q    Good morning, Mr. Singal.

4      A    Hello.

5      Q    I apologize, I think I've been pronouncing your name wrong

6      this entire trial.

7           Mr. Singal, you owned a number of businesses, correct?

8      A    I have.

9      Q    You would consider yourself a successful and sophisticated

10     businessman?

11     A    Not always successful, I don't know about sophisticated

12     either, but yeah.

13     Q    Well, you certainly managed a number of different

14     businesses, we could agree on that, correct?

15     A    Yes.

16     Q    You created three separate, publicly traded companies in

17     under three years, correct?

18     A    One publicly traded company and two public, non-traded

19     companies.

20     Q    You've been a member of the National Association of

21     Investment Trusts, correct?

22     A    I was at one time, yes.

23     Q    You've also been a member of the American Association of

24     Private Lenders?

25     A    I have been once, yep.

Singal - Cross by Delaney

1    Q    You are generally familiar with contracts?

2    A    I am, yes.

3    Q    You are generally familiar with financial obligations?

4    A    Yes.

5    Q    You're familiar with something called a post closing

6    condition?

7    A    I am, yes.

8    Q    You're familiar with a man named Gavin Harris, correct?

9    A    Yeah, Gavin Harris was the first witness that came up as a

10   broker of loans.

11   Q    Thank you.  You don't need to explain to the jury, just

12   respond to the questions, please.

13        You mentioned he's a broker.  He assisted you in obtaining

14   merchant cash advances.

15   A    Yeah.  Gavin Harris assisted folks in my organization with

16   obtaining loans as well as myself, yes.

17   Q    And that was on behalf of various different organizations,

18   correct?

19   A    That was on behalf of -- mainly on First Capital Real

20   Estate Investments and some First Capital Retail businesses.

21   Q    You worked with Mr. Harris prior to February 23, 2017?

22   A    Yeah, I think I worked with Mr. Harris for three years or

23   so, if I recall.

24   Q    And you also worked with him after February 23, 2017?

25   A    Yeah, I did work with him afterwards or folks on my staff

Singal - Cross by Delaney

1  A    Yes.

2  Q    And ultimately the decision was that the BDC would not

3  purchase First Capital Retail at that time.

4  A    You know, I can't answer exactly because this is past my

5  paygrade with all the lawyers we had hired.  They were just

6  working on different structures.  I don't recall any

7  acquisition.  I think there was a loan instrument being

8  discussed, if I recall.

9  Q    And I think that's where we got into the discussion about

10 the affiliate issue.  You're not a lawyer, correct, Mr. Singal?

11 A    I'm not a lawyer, that's for sure.

12 Q    You had a number of conversations with lawyers and with

13 Mr. McClure about the affiliate issue, correct?

14 A    I don't recall myself having those discussions.  I believe

15 my counsel at the time, Mr. Arostegui, having conversations

16 with those lawyers who were 40 Act lawyers.

17 Q    So were you sitting here in court when Mr. McClure

18 testified, correct?

19 A    Yes, correct.

20 Q    He testified that he had those discussions with you,

21 correct?

22 A    He testified that, yes.

23 Q    Is it your testimony, then, that Mr. McClure must have

24 lied about that?

25 A    I think it's been eight and a half years, so he may -- we

Singal - Cross by Delaney

1  had many conversations as Mr. McClure allured [sic] to many

2  different things, that certainly may be one of them, I just

3  don't recall.

4  Q    You understood there was something called an "affiliate

5  issue" that prevented the BDC from doing a loan to First

6  Capital while you were the owner of First Capital?

7  A    There was some type of an affiliate issue that required

8  some type of separation of interest at some point.

9  Q    So the decision at that time was for you to sell First

10 Capital Retail, correct?

11 A    That's what the lawyers came up with as one possible

12 solution, yes.

13 Q    And you sold that to Mr. -- the decision was to sell that

14 to Mr. Prasad, that was the plan?

15 A    Yeah, we intended to sell the business to Mr. Prasad.

16 Q    And you discussed that plan with Mr. Prasad?

17 A    Mr. Prasad had expressed for many years wanting to buy the

18 business.  So an opportunity came about where he could finally

19 go about the process to acquire it.

20 Q    You also discussed with him that the plan was for the BDC

21 to ultimately buy First Capital Retail back from him?

22 A    Not to my knowledge.  I don't recall the BDC having that

23 conversation.  I don't know all the rules of what BDCs can do

24 and not do in terms of businesses.

25 Q    I apologize for interrupting.  My question isn't what the

Singal - Cross by Delaney

1  BDC told him.  I'm asking, you told him that that was the plan?

2  A    I don't know if I told him that, but I certainly -- Mr.

3  Prasad and I talked about many things, including buying many

4  other businesses together, so it could have been in the course

5  of those conversations.

6  Q    And throughout the spring of 2017 you were talking to him

7  about a potential "rollup," correct?

8  A    I don't know if I spoke to Prasad about a "rollup," but we

9  did talk about a "rollup" that Mr. Prasad was a group of, many

10  times with many different companies.

11        THE COURT:  And, Ms. Delaney, I don't know what a

12  "rollup" is.  I don't know if the jury does.  You may want

13  to --

14        MS. DELANEY:  Fair enough, Your Honor.

15  BY MS. DELANEY:

16  Q    What were you referring to when you spoke about a

17  "rollup"?

18  A    There is a lot of terms for "rollup."  I think in this

19  context it was referring to combining certain businesses.

20  Q    Now, I want to turn and talk a little bit about the SEC

21  testimony.  When you were testifying before the SEC, you swore

22  an oath to tell the truth; is that correct?

23  A    I did.

24  Q    And you knew it was important to abide by that oath and to

25  tell the truth, correct?

1    up with what that is.  So, I am going to order that you all

2    meet and confer and see if you can come up with language or

3    part-of language.  What I envision, it would be one instruction

4    that -- I don't know what the law is on the ability of the

5    parties to modify the contract.  Based on the earlier motion to

6    dismiss, it seems like they can, and there is a factual issue

7    as to what the parties intended with respect to that.

8            So, I think either it's a factual issue or legal

9    issue, I don't know which one it is at this point.  So either

10   the parties could modify the contract, and I need to instruct

11   them on that possibility and they need to make a decision about

12   whether the contract was modified or not, or legally they

13   couldn't modify the contract and then that's not an issue for

14   them to decide and it's a me issue.  So I think the defense

15   needs to land on a theory here, I don't know which it is at

16   this point.

17           So, if it's your contention that they cannot legally

18   modify the contract, in that case I'm not sure -- I'm not sure

19   what I would be instructing the jury for.

20           If the parties could modify the contract, then I think

21   that is a jury question.

22           So, you need to think about which it is because I

23   don't think it could be both.

24           So, just to -- I'm now thinking out loud again, but

25   either you all think it's a legal issue that I need to resolve

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1   perhaps on a post-trial motion, or it's a factual issue for the

2   jury to resolve, then I do need to instruct them as to what

3   that looks like.

4            So, think about that, meet and confer.  See if you can

5   come up with language if language is necessary.

6            I think there is a factual issue there, and it does go

7   to the heart of the case, unless they are precluded as a matter

8   of law from modifying the contract, I will instruct the jury on

9   that.

10           The schedule you all have seems reasonable in terms of

11  that legal argument, if you need it.

12           Anything else we need to talk about at this point?

13           MR. PORTANOVA:  None.

14           MR. ENGLE:  Actually, I think procedurally, Your

15  Honor, we need to --

16           THE COURT:  Go ahead.

17           MR. ENGLE:  We need to renew our Rule 29 motion in

18  order to keep the issue preserved now that we've rested the

19  defense case.

20           THE COURT:  I'm not sure that's true, but the issue's

21  reserved.  I'll still defer ruling on it after the jury

22  verdict.

23           Anything else?

24           MR. ENGLE:  No, no, Your Honor.

25           THE COURT:  All right.  So, feel free to e-mail your

1  documents.  Although Mr. Michel is still out, you could e-mail

2  it to his e-mail address, it will be monitored by Jenny over

3  the weekend, and I think I'll just leave it there.

4        Anything else?

5        MS. DELANEY:  No.  Thank you, Your Honor.

6        MR. PORTANOVA:  No, Your Honor.

7        THE COURT:  All right, we'll see you all Monday at

8  9:00.  Thank you.

9     (Proceedings adjourned at 11:13 a.m.)

10

11              C E R T I F I C A T E

12

13    I certify that the foregoing is a true and correct

14  transcript of the proceedings in the above-entitled matter.

15

16  _____          July 21, 2025
    MARYANN VALENOTI, RMR, CRR          DATE
17  Official Court Reporter
    CA CSR #11266
18

19

20

21

22

23

24

25