# EXHIBIT C

6/17/2025 Trial Transcript (Excerpts)

<pre>
 1                  UNITED STATES DISTRICT COURT

 2                 EASTERN DISTRICT OF CALIFORNIA

 3                           --oOo--

 4   UNITED STATES OF AMERICA,    ) Case No. 2:22-CR-00068-DJC-1
                                  )
 5                                ) Sacramento, California
                    Government,   ) June 17, 2025, 9:12 a.m.
 6            v.                  )
                                  )
 7   SUNEET SINGAL,               ) Re: Trial Day 2
                                  )
 8                   Defendant.   )

 9
                       TRANSCRIPT OF PROCEEDINGS
10         BEFORE THE HONORABLE DANIEL J. CALABRETTA
                  UNITED STATES DISTRICT JUDGE
11
     APPEARANCES:
12   For the Government:      U.S. DEPARTMENT OF JUSTICE by
                              MR. NICHOLAS M. FOGG,
13                            ASSISTANT U.S. ATTORNEY
                              MS. JESSICA LOUISE DELANEY,
14                            ASSISTANT U.S. ATTORNEY
                              501 I Street, Suite 10-100
15                            Sacramento, California  95814

16   For the Defendant:      STRADLEY, RONAN, STEVENS & YOUNG by
                              MR. MICHAEL J. ENGLE
17                            2005 Market Street
                              One Commerce Square, Suite 2600
18                            Philadelphia, Pennsylvania  19103

19                            WILLIAM J. PORTANOVA, ATTORNEY AT LAW
                              MR. WILLIAM JOHN PORTANOVA
20                            400 Capitol Mall, Suite 1100
                              Sacramento, California  95814
21
                       MARYANN VALENOTI, RMR, CRR
22                        Official Court Reporter
                          501 I Street, Suite 4-200
23                         Sacramento, CA 95814
                          mvalenotiRMRCRR@gmail.com
24                            (916)930-4275

25   Proceedings reported via mechanical steno - transcript produced
     via computer-aided transcription
</pre>

Geller - Direct by Fogg

1  Q    Whose information would be listed as Seller's Information?

2  A    The seller would be the company that we would finance.

3  They would be selling us their receivables.

4  Q    How many companies are -- well, let me ask this way:  How

5  many companies are listed in the Seller's box on the front page

6  of Exhibit 208?

7  A    Two.

8  Q    Was it normal to have two companies listed and Merchant

9  Sales Agreements to have one?

10  A    It wasn't uncommon.

11  Q    Why might Happy Rock have two companies instead of one

12  listed?

13  A    Well, sometimes different businesses would have multiple

14  locations under different entity names.  In this case I believe

15  there are two entities listed because one of the companies is

16  actually owned by the other company.  So in a limited liability

17  company an owner can be an entity, and in this case that was

18  what was taking place.

19  Q    So what are the two companies' names listed on this first

20  page of 208?

21  A    We have First Capital Real Estate Investments, LLC, doing

22  business as First Capital Real Estate Investments.  And then we

23  have First Capital Retail, LLC, doing business as First Capital

24  Retail.

25  Q    You mentioned a second ago about one LLC owning the other,

Geller - Direct by Fogg

1  and I just wanted to clarify that.  As you understand this

2  agreement, did one of the LLCs listed own the other one?

3  A    My memory isn't a hundred percent accurate.  I mean, I'm

4  not a hundred percent positive, but I'm pretty certain that

5  First Capital Real Estate Investments was the owner of First

6  Capital Retail, LLC.

7         MR. FOGG:  Ms. Kenny, please zoom out again, please,

8  and could you expand the Guarantor box, please.

9  BY MR. FOGG:

10 Q    So, Mr. Geller, if you look further down the page, there's

11 a box that says "Guarantor's Information."

12 A    Yes.

13 Q    In this context what's a guarantor?

14 A    The guarantor is the person guaranteeing the terms of the

15 agreement, the obligations under this Merchant Sales Agreement.

16 Q    Who's listed here as guarantor?

17 A    Suneet Singal.

18 Q    Does the guarantor need to be the owner of the merchants?

19 A    Generally, yes.

20 Q    Why is that?

21 A    Again, because the owner had the authority to bind the

22 company, had the authority to enter into this contract, was

23 responsible to make the payments, and it was the closest

24 connection that we had to having somebody responsible and to

25 hold accountable for the funding.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Geller - Direct by Fogg

1   Q    And in deciding whether to fund a merchant cash advance,

2   what is the relative importance of the financial health of the

3   merchants as opposed to the owner's assets?

4   A    Well, it was both -- it was generally both.  I mean, we

5   wanted to see strong cash flow in the business.  We wanted to

6   make sure that the owner, you know, had a good track record as

7   far as background, as far as credit, you know, no judgments,

8   bankruptcies, you know, so we would vet these -- the owners,

9   because again, the company is run by the owner, and the

10  guaranty is only as good as the person who signs it.

11       MR. FOGG:  Ms. Kenny, could we zoom back out, please.

12  BY MR. FOGG:

13  Q    And the last thing on this page I want to show you,

14  Mr. Geller, do you see the portion of Exhibit 208 on the first

15  page we have blown up on the screen?

16  A    I do.

17  Q    It says "Purchased Amount."  What does that mean?

18  A    That's the amount of money that was due to Happy Rock.  So

19  we would -- for a fixed amount of money we would purchase the

20  right to receive, in this case, $512,000.

21  Q    And then go further down to where we have blown up, it

22  says, "$400,000 shall be disbursed," what does that mean?

23  A    That means that we provided First Capital Retail with an

24  additional $400,000, because this was a second funding with

25  First Capital.

Geller - Cross by Mr. Engle

1    Q    All right.  As a result of the funding of the agreement,

2    you entered into what we saw as Government Exhibit 208.

3            MR. ENGLE:  And if we could, please, bring that up on

4    the screen.  Could we please go to the last page of the

5    document.  Is there one more beyond that?  Thank you.

6    BY MR. ENGLE:

7    Q    Can you see the last page of the Merchant Sales Agreement

8    that was dated April 19, 2017, sir?

9    A    I do.

10           MR. ENGLE:  Could we highlight the top section that

11   says "Unconditional Personal Guaranty," the whole section, if

12   you can.  Thank you.

13   BY MR. ENGLE:

14   Q    Sir, the language that we're seeing here that's been

15   highlighted in Government Exhibit 208, that, in fact, is the

16   section that creates the personal guaranty by the individual,

17   Mr. Singal in this instance, that was part of the collateral

18   for the loan; is that right?

19   A    Could you repeat that, please.

20   Q    This is the section of the agreement that creates an

21   unconditional personal guaranty of the loan by Mr. Singal as an

22   individual, correct?

23   A    Correct.

24   Q    So in terms of who's securing the loan, it was the entity

25   and the entity's assets and also Mr. Singal and his personal

Geller - Cross by Mr. Engle

1  assets, correct?

2  A    Correct.

3  Q    Which is why when we see in the Confession of Judgment,

4  Mr. Singal is listed as a defendant individually in his own

5  personal capacity; isn't that right?

6  A    Yes.

7  Q    Okay.  And would you agree with me that in the section

8  about the unconditional personal guaranty, it says, "The

9  undersigned owner, collectively the Guarantor, who are the

10  owners of the sellers, hereby jointly and severally

11  unconditionally and irrevocably personally guarantee full

12  payment of the purchased amount due to the buyer and

13  performance of all terms and conditions of the Merchant Sales

14  Agreement including Section 3 of this Merchant Sales Agreement

15  which is entitled 'Seller's Representations, Warranties, and

16  Conduct'"; did I read that correctly, sir?

17  A    I believe so.

18  Q    In this instance, the "owner of the seller" would have

19  been Mr. Singal?

20  A    Yes.

21  Q    And that meant he was personally guaranteeing, jointly,

22  and severally along with the company, that this money would

23  have to be paid back?

24  A    Yes.

25  Q    Okay.  To the tune of roughly half a million dollars,

Geller - Cross by Mr. Engle

1  correct?

2  A    Correct.

3  Q    Now, do you see the section that starts with, "Guarantors

4  hereby jointly and severally unconditionally and irrevocably

5  guaranty the immediate payment of all monies owed to the buyer

6  by seller under the agreement, whether or not the guaranteed

7  obligations are found to be invalid, illegal, or unenforceable.

8  This being a guaranty of payment and not a guaranty of

9  collection."  Did I read that correctly, sir?

10 A    Yes.

11 Q    So that means that the owner who signs off on this and

12 gives the personal guaranty of liability of their own assets,

13 they're on the hook for that no matter what, correct?

14 A    In this instance, yes.

15 Q    Okay.  In this instance you obtained the Confession of

16 Judgment document, which we saw Government Exhibit 209, which

17 would be a document that if there was a default, it could be

18 immediately filed in court, in this instance, in the State of

19 New York; is that correct?

20 A    Correct.

21 Q    And the purpose of a Confession of Judgment is that if the

22 party agrees to confess judgment, they agree to essentially

23 bypass the whole system of a civil lawsuit allowing the lender

24 to get an immediate judgment against them, the company, and

25 Mr. Singal personally, correct?

Eskenazi - Direct by Fogg

1  A    That date is the date that the agreement was drafted.

2  Q    And the next line down it says "Merchant's Legal Name."

3  A    Yes.

4  Q    What information goes in Merchant's Legal Name?

5  A    Sorry.

6  Q    I didn't ask that question very clearly, let me try again.

7       What's the significance of the information, the name in

8  Merchant's Legal Name?

9  A    The Merchant's Legal Name is the actual entity that is

10 receiving the advance.

11 Q    Let's go further down, about the middle of the page,

12 please, and we'll talk about the purchase price.

13      So, Mr. Eskenazi, do you see where it says "Receipts

14 Purchased Amount"?

15 A    Yes.

16 Q    What does that mean?

17 A    That's the amount of future sales receivables that we are

18 purchasing.

19 Q    And then where it says "Purchase Price $150,000," what

20 does that number mean?

21 A    That's the price that we are paying for the purchase

22 amount, so obviously, there's a discount, so we're paying less

23 than the actual value of the receivables.

24 Q    Okay.  Then further down this page we have a signature

25 block.  Do you see that on the screen in front of you?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Eskenazi - Direct by Fogg

1    A    Yes.

2    Q    How many signatures do you see?

3    A    Two.

4    Q    And the first one is listed under "For The Merchant."  Who

5    would be signing for the merchant?

6    A    The owner of the business.

7    Q    Whose name is listed there under "For The Merchant

8    Number 1"?

9    A    Suneet Singal.

10   Q    And further down there's a second signature under

11   "Guarantor Number 1."  What does it mean to have a guarantor

12   here?

13   A    That's the individual guarantor that is guaranteeing the

14   transaction.

15   Q    Whose name is listed there?

16   A    Yes.

17   Q    I'm sorry, whose name is listed there under Guarantor 1?

18   A    Suneet Singal.

19   Q    Did World Global ultimately fund this merchant cash

20   advance?

21   A    Yes.

22   Q    If you had learned before you funded this merchant cash

23   advance that Suneet Singal had sold FCR, would that have

24   affected your decision to approve this merchant cash advance?

25   A    Absolutely, we would never have funded that business.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Eskenazi - Direct by Fogg

1   Q    Why is that?

2   A    Because only the owner of the business can make the

3   decision and sign those documents.

4   Q    So just one moment, please, Mr. Eskenazi.  I need to

5   manage my exhibits for just a second.

6        Can you turn the binder in front of you to Page 205,

7   please.

8   A    I'm there.

9   Q    Do you recognize Exhibit 205?

10  A    Yes, that's the Confession of Judgment that we use for our

11  contracts.

12  Q    And does it list -- on the front of that page does it list

13  who signed that Confession of Judgment?

14  A    I'm sorry, I didn't hear that.

15  Q    I'll ask that again a different way.

16       Is the signer of the Confession of Judgment listed on the

17  first page of 205?

18  A    First page, let me see.  Yes, yes, it is.

19  Q    And who is listed as the signer?

20  A    Suneet Singal.

21  Q    And do you see above that a caption that lists defendants?

22  A    Yes.

23  Q    Who are the listed defendants?

24  A    Both the business, the legal entity, and the individual

25  Guarantor.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Eskenazi - Cross by Mr. Engle

1  of remembering that?

2  A    Right.

3         MR. ENGLE:  Now, if we could please pull up government

4  Exhibit 205.

5  BY MR. ENGLE:

6  Q    And if you have that in front of you as well, do you see

7  Paragraph 4 on the first page of Government Exhibit 205?

8  A    Yes.

9  Q    That's the Confession of Judgment, or the first of the two

10  Confession of Judgments we just looked at this morning; is that

11  right?

12  A    Yes.

13  Q    And Paragraph 4 is where the merchant defendant, in this

14  particular instance First Capital Retail, LLC, confesses

15  judgment in the amount of 210,000 plus applicable interests and

16  other fees; is that correct?

17  A    Correct.

18  Q    If we could go to the next page, do you see Paragraph 5?

19  A    Yes.

20  Q    And that says, "In addition, I, hereby confess judgment

21  individually and personally, jointly and severally, and

22  authorize entry of judgment in favor of plaintiff and against

23  myself in," and then it lists a whole bunch of different courts

24  in New York; is that fair?

25  A    Yes, yes.

Eskenazi - Cross by Mr. Engle

1  Q    And that's where Mr. Singal himself, who's listed as an

2  individual defendant, is saying he personally confesses

3  judgment against him, not the company, correct?

4  A    I'm sorry, repeat that one more time.

5  Q    This is where Mr. Singal is personally confessing judgment

6  against him as an individual rather than against the company?

7  A    No.

8  Q    No?

9  A    No.  Because if you look at the document, it says on the

10  first page, okay, let's see, yeah, on the first page it says

11  the defendants are First Capital Retail and Suneet Singal,

12  meaning that in the event we enter this judgment, we have

13  judgment on the company and as a backup on the personal

14  guarantor, which is Suneet Singal.

15  Q    Right.  That's what I was just asking you.  This

16  Confession of Judgment in Paragraph 4 gives you an immediate

17  judgment against First Capital Retail, LLC, if there was a

18  default, correct?

19  A    Correct, and also the personal guarantor, which is Suneet

20  Singal.

21  Q    Right.  That's what we see in Paragraph 5, correct?

22  A    Yes, yes.

23  Q    Right.  So he is saying in that document that he's

24  personally confessing judgment in that amount of $210,000, plus

25  33 percent interest and all these other fees associated with

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Eskenazi - Redirect by Mr. Fogg

1  that paragraph; is that correct?

2  A    Yes.

3  Q    Meaning, that he put himself and his personal assets on

4  the line, and if there was a default, you would be able to go

5  after him personally and his personal assets, right?

6  A    Correct.

7  Q    Okay.  Thank you.

8         MR. ENGLE:  Your Honor, I have no further questions,

9  thank you.

10         THE COURT:  Any redirect?

11         MR. FOGG:  Briefly, Your Honor.

12                    REDIRECT EXAMINATION

13  BY MR. FOGG:

14  Q    Mr. Eskenazi, in making the decision whether or not to

15  fund a merchant cash advance, how important was the financial

16  situation of First Capital Retail as opposed to the financial

17  situation of the guarantor, Mr. Singal?

18  A    It's very important because that's pretty much the only

19  thing we are looking at.  Part of the underwriting process is

20  to look at the corporation, the flow of money, the income, the

21  type of business that we're getting into, the type of client

22  that are paying the business.

23         On the personal side of the personal guarantor, we -- I

24  mean, besides a background check and maybe checking a credit

25  score, we don't do personal asset searches.  We only review the

Eskenazi - Recross by Mr. Engle

 1  business.  This is a business transaction based on the revenue
 2  of the business, not based on the personal assets of the
 3  personal guarantor.  It's not a collateral-based transaction.
 4  It's a revenue-based transaction and decision making.
 5              MR. FOGG:  Understood.  Thank you, Mr. Eskenazi.
 6              The government has no further questions, Your Honor.
 7              THE COURT:  Any recross?
 8              MR. ENGLE:  Very briefly.
 9                      RECROSS-EXAMINATION
10  BY MR. ENGLE:
11  Q    Mr. Eskenazi, obviously there is a purpose to having the
12  personal guaranty and Confession of Judgment from the
13  individual, right?
14  A    Correct.
15  Q    Because that has value, correct?
16  A    It does, as a backup, yes.
17              MR. ENGLE:  Okay, thank you.
18              THE COURT:  Any redirect?
19              MR. FOGG:  No, Your Honor.  Thank you.
20              THE COURT:  You can step down.  Thank you very much
21  for your time.
22              THE WITNESS:  Thank you.
23          (Witness is excused.)
24              THE COURT:  All right.  So why don't we take our
25  morning break at this point.  So, members of the jury, I'll ask

Milian - Direct by Delaney

1   A    The business owner.

2   Q    Then right near the bottom of that box, there's a box that

3   says "Monthly Average Sales Number." Where would that number

4   come from?

5   A    So, that comes from the last three months of bank

6   statements.  That's an average; combined and then averaged out.

7   Q    Whose bank statements would that be drawn from?

8   A    From the business, the business in this case First Capital

9   Retail, LLC.

10  Q    And then just to the right of that it says "Annual Sales,"

11  and there's another number.  Where would that number come from?

12  A    That would be the same, from our system.  So once we input

13  the numbers, it gives you an average for monthly and then it

14  makes it annual.  So it would be --

15  Q    So, again, drawn from the bank statements?

16  A    From the bank statements provided, I'm sorry, yes.

17       MS. DELANEY:  All right.  Ms. Kenny, if we could zoom

18  back out, and then we'll come in in the section just below.

19  BY MS. DELANEY:

20  Q    So, the first box listed here says "Purchase Price

21  $200,000."  What does that reflect?  What would the $200,000 --

22  what is that?

23  A    So, that is the amount that the business will be getting

24  from Everest Business Funding.

25  Q    So that's the amount being paid by Everest?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Milian - Direct by Delaney

1  A    Correct.

2  Q    The next box says "Purchased Amount."  What does that

3  mean?

4  A    That would be the payback, the amount that the business

5  would have to return to Everest Business Funding.

6  Q    And next to it I see "Daily Payment."  What does that

7  mean?

8  A    So that is how they would be paying the purchase amount in

9  daily payments, Monday through Friday, of that amount.

10  Q    Okay.  So unlike a mortgage payment which is paid once a

11  month, this would be paid on a daily basis?

12  A    Monday through Friday only, only business days.

13        MS. DELANEY:  Ms. Kenny, if we could zoom out again.

14  We'll go just to the bottom part now.

15  BY MS. DELANEY:

16  Q    At the bottom of that page I see again a series of boxes

17  and the first says "For The Seller:  Suneet Singal."  Who would

18  be signing in that box?

19  A    The business owner.

20  Q    And below it I see "For The Owner and Guarantor:  Suneet

21  Singal."  Are you aware of why there would be two signatures on

22  this document?

23  A    I believe it's because there is a personal guaranty on

24  this agreement.

25  Q    So, there would be the signature on behalf of the business

Milian - Direct by Delaney

1  and the signature for the personal guaranty?

2  A    Correct.

3        MS. DELANEY:  You can go ahead and take that down,

4  Ms. Kenny.  Thank you.

5  BY MS. DELANEY:

6  Q    I'd like to turn now in that same binder to tab 202.  Do

7  you recognize what's depicted at 202?

8  A    I do.

9  Q    What is that document?

10 A    It's a Confession of Judgment.

11 Q    And was this a necessary document at Everest in 2017

12 before funding a cash advance?

13 A    Only for deals above $50,000.

14 Q    Understood.  So lower number deals might not require a

15 Confession of Judgment?

16 A    Correct.

17 Q    Looking at the purchase price that we looked at earlier,

18 would this particular sales agreement have required a

19 Confession of Judgment?

20 A    Yes.

21       MS. DELANEY:  At this time, Your Honor, I move to

22 admit Exhibit 202.

23       THE COURT:  Any objection?

24       MR. ENGLE:  No objection.

25       THE COURT:  202 will be admitted.

Milian - Direct by Delaney

1        MS. DELANEY:  Ms. Kenny, if we could publish that.

2        (Government Exhibit 202 admitted in evidence.)

3    BY MS. DELANEY:

4    Q    So, I want to look in particular at Paragraph 2 of this

5    document.  It states there, "I am a principal, owner, officer

6    and director of First Capital Retail, LLC, doing business as

7    First Capital Retail, LLC."  Is this a paragraph that was

8    common to the Confessions of Judgment used for merchant cash

9    advances?

10   A    Yes.

11       MS. DELANEY:  And then if we could go, Ms. Kenny, to

12   the second-to-last page, Page 3.

13   BY MS. DELANEY:

14   Q    Ms. Milian, I see, again, there are two signatures.  The

15   first is Suneet Singal, and the second is again Suneet Singal

16   on behalf of First Capital Retail.  To your understanding, who

17   would have to sign the Confession of Judgment?

18   A    The business owner.

19       MS. DELANEY:  We can take that down, please.

20   BY MS. DELANEY:

21   Q    As part of that application for merchant cash advances at

22   Everest Business Funding, was there a requirement that the

23   Confessions of Judgment would be sent back in hard copy form?

24   A    Yes.

25   Q    Would Everest Business provide a shipping label for that?

Milian - Cross by Mr. Engle

1  A    Yes.

2  Q    Are you familiar with the address for Everest Business

3  Funding?

4  A    Yes.

5  Q    And is that address 2001 Northwest 107th Avenue, Miami,

6  Florida?

7  A    Yes, it was at the time.

8        MS. DELANEY:  Thank you, Ms. Milian.  Those are all

9  the questions I have.  Defense counsel may have some as well.

10        THE WITNESS:  Okay.

11        THE COURT:  Any cross?

12        MR. ENGLE:  Briefly, Your Honor, thank you.

13                    CROSS-EXAMINATION

14  BY MR. ENGLE:

15  Q    Good morning, Ms. Milian.

16  A    Good morning.

17  Q    How are you?

18  A    Good, thank you.

19  Q    We were just talking about the agreement with First

20  Capital Retail, and you mentioned that there is a personal

21  guaranty accompanying that agreement, correct?

22  A    Yes.

23  Q    And that's the personal guaranty of the individual who is

24  signing off on the Confession of Judgment, correct?

25  A    Yes.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Milian - Cross by Mr. Engle

1   Q    So, in order to have the Confession of Judgment, that is

2   captioned against both the entity and the person who's making a

3   personal guaranty and putting their own assets on the line,

4   correct?

5   A    Yes.

6   Q    And in this particular instance, Mr. Singal indicated that

7   he had the authority to bind First Capital Retail to that

8   Confession of Judgment, as well as himself personally, right?

9   A    Yes.

10  Q    And so if there was a default, you would be able to go

11  after both the entity and Mr. Singal personally and his

12  personal assets to satisfy the judgment, correct?

13  A    Yes, that's what I believe it means.  I'm not an attorney,

14  but --

15  Q    I understand.  I'm just asking for your general

16  understanding.

17  A    Sure.

18          MR. ENGLE:  Thank so much.

19          Nothing further.

20          THE COURT:  Any redirect?

21          MS. DELANEY:  No, Your Honor, thank you.

22          THE COURT:  You could step down.  Thank you very much

23  for your time.

24          THE WITNESS:  Thank you.

25          (Witness is excused.)

Myers - Direct by Delaney

1    A    Yes.

2    Q    So I'd like to turn to Exhibit 101.

3    A    Okay.

4    Q    Go ahead and take a moment -- I know that one's a few

5    pages, go ahead and take a moment to look through it.

6    A    Okay.

7    Q    Do you recognize what Government Exhibit 101 is?

8    A    Yes.

9    Q    What is that document?

10    A    It's the transfer of interest in First Capital Retail.

11    Q    Is this one of the documents that was attached to the

12    e-mail that you sent?

13    A    Can you pull that back up so I can tell you?

14    Q    I'll pull up the initial e-mail again.

15    A    Yes, thank you.

16    Q    If we could republish Exhibit 101A.

17    A    Yes, it is.

18    Q    And which document is it -- is depicted at 101?

19    A    It would be the bottom one, FCR Membership Interest

20    Purchase Agreement.

21          MS. DELANEY:  Move to admit Government Exhibit 101.

22          THE COURT:  Any objection?

23          MR. ENGLE:  No objection.

24          THE COURT:  101 will be admitted.

25          (Government Exhibit 101 admitted in evidence.)

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Myers - Direct by Delaney

1        MS. DELANEY:  Ms. Kenny, if you could publish that.

2   BY MS. DELANEY:

3   Q    You mentioned this is the Membership Purchase Agreement,

4   just at a very broad level, what do you understand this

5   document to be?

6   A    First Capital Real Estate Investments selling its

7   membership interest in First Capital Retail to Ramesh Prasad.

8   Q    And then I notice a date up at the top of that document,

9   could you read that date for us?

10  A    February 23, 2017.

11  Q    Could I have you turn to the very last page of this

12  document, it's Page 22.  There's a number of signatures on this

13  page, I'd like to start with the top one.  Do you recognize the

14  signature under "Seller"?

15  A    Yes.

16  Q    And whose signature is that?

17  A    Suneet Singal.

18  Q    Are you aware of why he would have been the individual to

19  sign under the seller block?

20  A    He was the manager of First Capital Real Estate

21  Investments.

22  Q    And we've said before a few times First Capital Real

23  Estate Investments was the owner of First Capital Retail?

24  A    Yes.

25  Q    And then underneath it there's another signature under

Myers - Direct by Delaney

1    "Buyer." Do you recognize that signature?

2    A    Yes.

3    Q    Whose signature is that?

4    A    Ramesh Prasad.

5    Q    And under this document what is Mr. Prasad buying?

6    A    I'm sorry, I didn't hear you.

7    Q    What is he actually buying when he signs this document?

8    A    The interest in First Capital Retail.

9    Q    I would like you to --

10        MS. DELANEY:  We can take down that exhibit,

11   Ms. Kenny.

12   BY MS. DELANEY:

13   Q    If you could turn to Government Exhibit 102.

14   A    Okay.

15   Q    Do you recognize Government Exhibit 102?

16   A    Yes, it's the Promissory Note that's associated to the

17   purchase.

18   Q    And are you familiar, just generally as an accountant,

19   with what a promissory note is?

20   A    Yes.

21   Q    Can you explain to me what a promissory note is?

22   A    It's a promise to pay a debt.

23   Q    And was this document one of the ones attached to

24   Government Exhibit 101A?

25   A    Yes.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Myers - Direct by Delaney

1    MS. DELANEY:  At this time, Your Honor, I move to

2  admit Government Exhibit 102.

3    THE COURT:  Any objection?

4    MR. ENGLE:  No objection.

5    THE COURT:  102 will be admitted.

6    (Government Exhibit 102 admitted in evidence.)

7    MS. DELANEY:  Ms. Kenny, if we could publish that.

8  BY MS. DELANEY:

9  Q    Let's zoom in just on this first portion.  Now, on the

10  left hand of this screen, Ms. Myers, I see 11,500 [sic].  Do

11  you know what that number represents?

12  A    It's 11,500,000.

13  Q    Thank you for correcting my math.  I should never read

14  numbers in court, I'll always get them wrong.

15    11,500,000, do you know what that represents?

16  A    It's the value of the promissory note.

17  Q    Can you read the date at the upper up right-hand corner of

18  the document?

19  A    February 23, 2017.

20  Q    Could you please turn to the last page of that exhibit,

21  it's Page 5.

22  A    Okay.

23  Q    Do you recognize the signature on that document?

24    THE COURT:  It's also on the screen, if that's

25  helpful.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Myers - Direct by Delaney

1    THE WITNESS:  I don't recognize that signature.

2         MS. DELANEY:  I'd like to turn back, briefly,

3    Ms. Kenny, if we could republish 101A, and just zooming in on

4    the top again.

5    BY MS. DELANEY:

6    Q    So, Ms. Myers, it looks like the sent date is listed as

7    February 24, 2017.  Is it your understanding that at or near

8    that date is when FCREI sold First Capital Retail to

9    Mr. Prasad?

10   A    Yes.

11        MS. DELANEY:  All right.  We can take down that

12   exhibit.

13   BY MS. DELANEY:

14   Q    I'll get you away from the binder, Ms. Myers, and just

15   talk to you about some of the things happening in the company.

16        So, after that sale occurred, did anything change for you

17   and your job and responsibilities?

18   A    No.

19   Q    To the best of your knowledge, were there any other

20   functional changes at the business?

21   A    No.

22   Q    Are you aware of why nothing changed?

23   A    No.

24   Q    Was there a point when there was a change in operation of

25   First Capital Retail?

Myers - Direct by Delaney

1   A    Late August, early September.

2   Q    And what happened in August or September -- I'm sorry, I

3   should have asked the date; is that 2017?

4   A    Yes.

5   Q    What changed in August or September of 2017?

6   A    Ramesh moved out of the Gold River office into his own

7   office and opened new banks accounts.

8   Q    So between February and August of 2017, who was handling

9   payroll for First Capital Retail?

10  A    I was.  Well, my staff.

11  Q    Did you ever move your job to First Capital Retail?

12  A    What do you mean?

13  Q    I guess -- you mentioned earlier that you were working for

14  First Capital Management, so when Mr. Prasad bought First

15  Capital Retail, did you have to start working for Mr. Prasad as

16  well as for First Capital Management, or did you continue just

17  working for First Capital Management?

18  A    I worked for both.

19  Q    And did you continue -- we talked about earlier how there

20  were a number of transfers between the different companies.

21  Did that continue to happen after the February sale?

22  A    Transfers between the various companies?

23  Q    Between the bank accounts belonging to the different

24  companies, I apologize.

25  A    Well, there was always transfers between First Capital

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Myers - Direct by Delaney

1   Management and Retail because of payroll, so there was always

2   transfers happening.  I don't know specifically what you're --

3   Q    That's all I was asking.  Thank you.

4        First Capital Management, did it continue to be owned by

5   First Capital Real Estate Investments?

6   A    I'm pausing because First Capital Management had a couple

7   other partners as well.  I'm not sure when the transition

8   happened to just First Capital Real Estate Investments.

9   Q    Understood.

10       In your role as the controller and accountant, did you

11  maintain various business records?

12  A    Yes.

13  Q    And did you maintain, for instance, records regarding the

14  accounts payable to different entities?  Why don't we look at

15  the exhibit again, sometimes that's easier.  Why don't you take

16  a look at Government Exhibit 108.

17  A    Okay.

18  Q    Do you recognize what is located at Tab 108?

19  A    It appears to be a general ledger detail, like a

20  QuickBooks, which is the accounting software we used, general

21  ledger detail.

22  Q    Is this a record that would generally be maintained by you

23  as the controller of the various companies?

24  A    Yes.

25  Q    Is this a document -- so, I notice a number of entries in

Myers - Cross by Mr. Engle

1          MS. DELANEY:  Hearsay.

2          MR. ENGLE:  I'm asking, Your Honor, if she remembers

3    whether or not something occurred.  That's not hearsay.

4          THE COURT:  The filing itself might be, but I think

5    maybe the business rule exception will apply anyway, so I'm

6    going to overrule.

7          MR. ENGLE:  Thank you, Your Honor.

8          THE COURT:  You can answer.

9    BY MR. ENGLE:

10   Q    Do you remember -- let me do it again.

11        Do you recall that in the middle of September 2017, there

12   was a document filed with the corporate authorities in the

13   State of California naming Mr. Prasad then as the managing

14   member of First Capital Retail?

15   A    I don't know if that document was filed.  I wasn't part of

16   that.

17   Q    You don't remember ever seeing that?

18   A    I don't remember seeing it.  It was so long ago.

19   Q    I totally understand.

20        I'd like to show you what's been marked as Defense

21   Exhibit CY to see whether or not this refreshes your

22   recollection.

23          MR. ENGLE:  Your Honor, I --

24          THE COURT:  Go ahead.

25          And if you're just approaching to give the witness

Myers - Cross by Mr. Engle

1  something, if you're showing it to the government, you don't

2  have to ask for permission.

3           MR. ENGLE:  Thank you, Your Honor.

4  BY MR. ENGLE:

5  Q    I just want you to take a look at this document and just

6  see whether or not that helps refresh your recollection about

7  what we're talking about.

8  A    Okay.

9  Q    Have you ever seen that document before?

10 A    I possibly have seen it.  I was the registered agent, per

11 se, for this entity, but it makes sense, like I would believe

12 that this document is valid.

13 Q    Based upon that, does it refresh your recollection as to

14 the timeframe in which this information was conveyed to the

15 State?

16 A    Yes.

17 Q    And does it sound right that it was in the middle of

18 September of 2017?

19 A    Yes.

20 Q    And the change was that before Suneet Singal would have

21 been the managing member of First Capital Retail, this would be

22 changing it to Ramesh Prasad; is that right?

23 A    That is correct.

24 Q    Okay.  Thank you, Ms. Myers.

25      Now, you mentioned that you felt pretty confident that you

Myers - Cross by Mr. Engle

1   knew about 70 to 80 percent of the financial picture of what

2   was going on with Mr. Singal's various business entities; is

3   that correct?

4   A    Yes.

5   Q    Okay.  So you were involved in a lot of the day-to-day

6   activity, but maybe not every business decision that was being

7   made; is that fair?

8   A    Yes.

9   Q    All right.  There may be transactions or deals that were

10  being done by Mr. Singal that you weren't privy to?

11  A    That's correct.

12  Q    All right.  And you were not involved in the negotiation

13  of the sale of FCR from Mr. Singal to Mr. Prasad, correct?

14  A    No, I was not.

15  Q    You just happened to see some of the documents in the

16  course of you doing your job?

17  A    Correct.

18  Q    Now, when you were shown Government Exhibit 409, which is

19  now in evidence --

20       MR. ENGLE:  And we don't need to bring it up at the

21  moment.  Thank you.

22  BY MR. ENGLE:

23  Q    And in that e-mail you were mentioning an issue about

24  execs Ron, Ramesh, Peter, myself not having been able to cash

25  their paycheck; do you remember that?

Myers - Cross by Mr. Engle

1  A    I do.

2  Q    So there were a number of different executives that we

3  were talking about with respect to the different companies that

4  Mr. Singal owned; do you recall that as well?

5  A    Yes.

6  Q    And Ron and Ramesh and Peter and you were some of those

7  individuals?

8  A    Yes.

9  Q    Okay.  And all of those executives, they were employees of

10 those different entities, correct?

11 A    We were employees of First Capital Management, which was

12 then reimbursed by the various entities.

13 Q    Right.  And paid a salary that was processed by First

14 Capital Management?

15 A    That's correct.

16 Q    And that applied to Ramesh Prasad, even though he held the

17 title of president, he was a salaried employee, correct?

18 A    That is correct.

19 Q    All right.  Thank you.

20      And consistent with what we were just talking about, about

21 the corporate document in the middle of September of 2017, I

22 believe you testified earlier that you noticed a change in the

23 way that things were being done in late August and early

24 September where Mr. Prasad was asserting actual control of FCR

25 at that time; is that right?

Myers - Cross by Mr. Engle

1  A    That is correct.

2  Q    And one of the things that he did to assert control -- I

3  think you may have mentioned this on direct, but please correct

4  me if I'm wrong, was actually moving the office location for

5  FCR to a different physical location?

6  A    That is correct.

7  Q    And also one of the other steps that was being taken by

8  Mr. Prasad to assert control over First Capital Retail was to

9  change the bank accounts; is that also correct?

10  A    Yes, it is.

11  Q    That also took place in September of 2017, if you recall?

12  A    Late August, early September, somewhere in there.

13  Q    Somewhere in that timeframe?

14  A    Yes.

15  Q    And that's because prior to that timeframe, late August

16  early September of 2017, all the bank accounts for FCR remained

17  in Mr. Singal's name; didn't they?

18  A    That is correct.

19  Q    I'd like to show you what is marked Defense Exhibit DY.

20      MR. ENGLE:  Do you want a copy, Your Honor?  I want to

21  make sure you had it up there in case you need it.

22      THE COURT:  I do, yeah.

23      MR. ENGLE:  Thank you.

24  BY MR. ENGLE:

25  Q    Ms. Myers, will you take an opportunity to flip to the

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Myers - Cross by Mr. Engle

1  last page and work your way to the front page of that exhibit,

2  please.

3  A    Okay.

4  Q    Do you recognize that as a series of e-mails in which you

5  were e-mailing back and forth with a variety of people that you

6  worked with?

7  A    Yes.

8  Q    And does it appear that this e-mail chain occurred on

9  Friday, July 7, 2017?

10  A    Yes.

11  Q    Do you recognize the names and e-mail addresses that are

12  referenced in the various e-mail messages in this chain?

13  A    Yes.

14         MR. ENGLE:  Your Honor, at this time we move the

15  admission of Defense Exhibit DY.

16         THE COURT:  Any objection?

17         MS. DELANEY:  Yes, Your Honor, hearsay.

18         THE COURT:  It does appear to be hearsay.

19         MR. ENGLE:  I'm sorry?

20         THE COURT:  It does --

21         MR. ENGLE:  They're her messages, so the messages that

22  she wrote --

23         THE COURT:  And it's still hearsay.  You can ask her

24  about it.  She's here live, you can ask her questions, but --

25  you can try to refresh her recollection, but this is hearsay.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Myers - Cross by Mr. Engle

1        MR. ENGLE:  Okay.

2   BY MR. ENGLE:

3   Q    Do you recall on July 7, 2017 Mr. Prasad indicating that

4   his salary should be increased by a certain amount of money?

5   A    After seeing these e-mails, yes.

6   Q    Do you recall that he was asking for that to occur and

7   that you --

8        MS. DELANEY:  Your Honor, I would just request that

9   the witness not be allowed to just read through the document.

10  That's just introducing hearsay through her reading and that

11  counsel follow the appropriate steps to refresh her

12  recollection.

13       MR. ENGLE:  I'll take --

14       THE COURT:  Okay.  Let's do it the right way.  Go

15  ahead.

16  BY MR. ENGLE:

17  Q    Ma'am, do you recall that after Mr. Prasad indicated that

18  his salary was to be increased by some amount of money on a

19  biweekly basis, that you took some action to verify whether

20  that was appropriate?

21  A    Yes.

22  Q    And what did you do to verify that that raise in his

23  salary would be approved?

24  A    I asked Suneet if it was approved.

25  Q    And did he approve it, if you remember?

Myers - Cross by Mr. Engle

1   A    I don't remember.

2   Q    Okay.  But you knew that you should go to Mr. Singal at

3   that time, July 7, 2017, to make sure that he approved of an

4   increase in the salary of one of his employees?

5   A    Yes.

6   Q    And am I correct that you understood the business

7   structure with respect to FCR and FCRE, to be that FCRE, in

8   essence, owned FCR and Mr. Singal was the managing member of

9   FCRE so that, in essence, made him the owner of FCR; was that

10  your understanding of how things worked?

11  A    Yes.

12  Q    Okay.

13         MR. ENGLE:  Court's indulgence.

14      (Pause in proceedings.)

15  BY MR. ENGLE:

16  Q    Do you remember an individual by the name of Ryan Lochan?

17  A    Yes.

18  Q    What was his role, if any, in relation to the various

19  entities that Mr. Singal owned?

20  A    I don't remember what his exact title was, but he worked

21  in the Gold River office.

22  Q    Do you remember whether he was related to anyone else who

23  worked with Mr. Singal?

24  A    He was Ramesh's son.

25  Q    So Ryan Lochan was Ramesh Prasad's son?

McClure - Direct by Fogg

1  Q     Could you describe for me an article of clothing he's
2  wearing?

3  A     Blue suit with appears to be a green tie.

4  Q     From your perspective, is there a person sitting to his
5  left?

6  A     To his left?

7  Q     I'm sorry, I got my perspectives screwed up.  Let me try
8  again.

9        From your perspective, is there a person on the left of
10 Mr. Singal?

11 A     On the left, yes, sir.

12 Q     Is that person a man or a woman?

13 A     It's a man.

14        MR. ENGLE:  Your Honor, we'll stipulate that they know
15 each other.

16        THE COURT:  I'll let the record reflect he's
17 identifying Mr. Singal.

18 BY MR. FOGG:

19 Q     Mr. McClure, did you sell your BDC to Mr. Singal?

20 A     Yes, sir.

21 Q     Do you recall approximately when you sold it to him?

22 A     I believe it officially closed in early April of 2019; is
23 that right?

24 Q     Was the sale structured in steps or was it that Mr. Singal
25 took it all at once?

McClure - Direct by Fogg

1  A    No, the original structure was that Mr. Singal and/or his

2  entities were going to buy a smaller piece of the BDC and then

3  close on the rest of it over a period of time.

4  Q    Was there a period during which both you and Mr. Singal

5  were working on the BDC?

6  A    Yes.

7  Q    Have you heard of a company called First Capital Retail or

8  FCR?

9  A    Yes.

10  Q    Did the BDC loan money to FCR?

11  A    Yes, sir.

12  Q    Did this loan happen while Mr. Singal had some sort of

13  ownership interest in the BDC adviser?

14  A    Yes, sir.

15  Q    Were there discussions within the BDC with Mr. Singal

16  about the BDC purchasing FCR?

17  A    About purchasing FCR?

18  Q    Yes, whether the BDC would purchase FCR?

19  A    Oh, gosh, we discussed -- I believe the answer would have

20  been there may have been a discussion.  There was discussions

21  about all kinds of various structures.

22  Q    But the structure you settled on was a loan?

23  A    Correct.

24  Q    How did a loan from the BDC to FCR get on the BDC's radar?

25  A    It was brought to our attention by Mr. Singal.

McClure - Direct by Fogg

1   Q    Can you describe for us the process of this potential loan

2   comes to BDC, how the BDC would evaluate that potential loan?

3   A    Yes.  We had a structure by which an analyst would be

4   assigned to create -- to provide what was commonly known as

5   "due diligence," to check the legal documents and obtain

6   financial records and check that the business is in good

7   standing, and that analyst would prepare a report, and it would

8   go to an investment committee for approval, and based upon the

9   analyst's recommendation and then the approval of the

10  investment committee, a loan could be finalized.

11  Q    During the review of a loan to FCR did an affiliate issue

12  come to light?

13  A    Yes, sir.

14  Q    Can you describe that affiliate issue for me, please?

15  A    Well, the lawyers -- I guess that there was, you know, a

16  potential that Mr. Singal's -- some of his companies owned

17  enough of the potential of retail that it would be considered

18  an affiliate of Mr. Singal.  And we brought that to the -- we,

19  being the other management members, brought that to the

20  attention of our attorneys and Mr. Singal's attorneys to

21  indicate that obviously that would be a violation of the

22  business -- the '40 Act and that there was an issue there.

23  Q    Did you discuss the affiliate issue with Mr. Singal?

24  A    Yes, I did.

25  Q    How many times would you say you discussed it with him?

McClure - Direct by Fogg

1   A    I don't know, many, many times, multiple times.

2   Q    Did you discuss it in person, over the phone or both?

3   A    Both.

4   Q    And speaking with Mr. Singal, did you all settle on a

5   solution to the affiliate issue?

6   A    Yes, sir.

7   Q    What was the solution?

8   A    That Mr. Singal would divest himself of whatever ownership

9   interest in FC Retail needed to be divested of to therefore

10  have the loan to the retail be -- to qualify as a non-affiliate

11  loan.

12  Q    What does it mean to divest ownership interest?

13  A    Sell.

14  Q    And did the BDC ultimately loan money to FCR?

15  A    Yes.

16  Q    And were the loan terms ran down in the contract?

17  A    I believe so, yes.

18  Q    There should be a binder up there, it should say

19  Government Exhibit 1, Binder 1, do you see that binder?  It may

20  be behind your right shoulder.

21  A    Right here?

22  Q    Yeah, that might be the binder, but it should say

23  "Governments Exhibits 1."

24  A    It says "Government Exhibit Binder Volume 2."  Oh, there's

25  something over here.

McClure - Direct by Fogg

1    THE COURT:  I think there's a sheet on top.  I think
2    you have the right binder.
3    THE WITNESS:  Yes, sir, this is Volume 1.
4    MR. FOGG:  Thank you, Your Honor.
5    THE COURT:  Do you want to grab that paper, though.
6    MR. FOGG:  May I approach?
7    THE COURT:  Go ahead.
8    BY MR. FOGG:
9    Q    Mr. McClure, can you turn to Exhibit 106 in that binder,
10   please.
11   A    Yes, sir.  106, okay.
12   Q    Do you have the binder open to Exhibit 106?
13   A    Yes, sir, I do.
14   Q    Do you recognize that document?
15   A    I do.
16   Q    What is it?
17   A    It's a loan agreement between First Capital Retail and
18   First Capital Investment Corporation, which is the new name for
19   what was previously Freedom Capital.
20   Q    The new name after Mr. Singal became involved in the BDC?
21   A    Correct.
22   Q    Does Exhibit 106 lay out the duties of the BDC under FCR
23   regarding the loan?  Let me ask that a little differently, I
24   don't think I asked that clearly.
25       Does it lay out the terms of the loan?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

McClure - Direct by Fogg

1  everyone time to use the restroom.  I know it's been kind of in

2  and out.  Let's say five or 10 minutes and just remember the

3  admonition, please, members of the jury.

4       (In open court outside the presence of the jury.)

5            THE COURT:  Folks, have a seat.  Anything we need to

6  address at this point?

7            MR. FOGG:  No, Your Honor.  Thank you.

8            MR. ENGLE:  No, Your Honor.

9            THE COURT:  All right.

10       (Recess taken 3:29 p.m. to 3:41 p.m.)

11            THE CLERK:  Please come to order, Court is back in

12  session.

13            THE COURT:  All right.  Anything before we bring back

14  the jury?

15            MR. FOGG:  No, Your Honor.

16            MR. ENGLE:  No, Your Honor.

17       (In open court in the presence of the jury.)

18            THE COURT:  Why don't you go get Mr. McClure while

19  we're getting the jury in.

20            Go ahead and have a seat.

21            Counsel, you're finished with your direct, right?

22            MR. FOGG:  I did, yes, Your Honor.

23            THE COURT:  All right.  Cross.

24            MR. ENGLE:  Thank you, Your Honor.

25            THE COURT:  Go ahead when you're ready.

McClure - Cross by Mr. Engle

1                        CROSS-EXAMINATION

2    BY MR. ENGLE:

3    Q    Good afternoon, Mr. McClure.

4    A    Good afternoon.

5    Q    During your direct examination, Mr. McClure, you were

6    shown and you identified a loan agreement that was dated

7    February 24, 2017; do you recall that?

8    A    Yes, sir.

9    Q    That's Government Exhibit 106 that's now in evidence.

10   A    Yes, sir.

11   Q    You have a copy up there?

12   A    Yes, sir.

13   Q    Okay.  And this loan agreement that is dated February 24,

14   2017 relates specifically to this loan that was being made from

15   the BDC to First Capital Retail, FCR?

16   A    Yes, sir.

17   Q    You recall the amount of that loan was $1.5 million?

18   A    Yes, sir.

19   Q    And as the normal course of business in dealing with one

20   of these loans you would expect that there would be another

21   document related to that known as a promissory note?

22   A    Yes, sir.

23         MR. ENGLE:  Could we call up Government Exhibit 101A,

24   please, which is in evidence, Your Honor.

25         THE COURT:  Yes, go ahead.

McClure - Cross by Mr. Engle

1  BY MR. ENGLE:

2  Q    And, sir, do you see Government Exhibit 101A on the

3  screen?

4  A    I do.

5  Q    And do you see at the bottom of the e-mail chain an

6  individual, Connor Prochaska, e-mailed a number of people,

7  including yourself, asking -- or attaching certain documents

8  relating to this BDC loan of $1.5 million to First Capital

9  Retail?

10  A    Yes, sir.

11  Q    And then do you see Windy Myers replied to that group,

12  including you, and attached a number of documents?

13  A    Yes, sir.

14  Q    And you see the first one is the "FCR Promissory Note,"

15  First Capital Investment Corporation dated 2/24/17; is that

16  right, sir?

17  A    Yes, sir.

18  Q    That would be the promissory note that would go along with

19  the loan agreement that we just saw, Government Exhibit 106,

20  correct?

21  A    I haven't read it, but I assume it to be true.

22  Q    And the next document is the "FCR Loan Agreement" with

23  First Capital Investment Corporation dated 02/24/17 as a .pdf;

24  do you agree?

25  A    Yes, sir.

McClure - Cross by Mr. Engle

1  Q    Would you expect that would be Government Exhibit 106, the
2  actual loan agreement itself?

3  A    I don't know, I would assume.

4  Q    Okay.  Then you see an "FCR Loan Consent, FCREI for First
5  Capital Investment Corporation" a .pdf, another document
6  relating to the loan transaction; is that correct?

7  A    I see it listed here, yes, sir.

8  Q    And then an "FCR Membership Interest Purchase Agreement"
9  with a date of 02/23/17 associated with it; is that correct?

10 A    Yes, sir.

11 Q    All of those documents were being circulated in connection
12 with the BDC loan to FCR; that's your understanding?

13 A    That's my understanding.

14 Q    All right.  Thank you.

15      MR. ENGLE:  We can take 101A down.

16 BY MR. ENGLE:

17 Q    Now, sir, you talked a bit about what's referred to as an
18 affiliate transaction or a prohibited transaction under the
19 Securities Act of 1940; do you recall that?

20 A    Yes.

21 Q    The Securities Act of 1940, often referred to as the '40s
22 Act, would prohibit a situation where a BDC would loan money to
23 an entity if there was an ownership interest on the BDC side
24 and on the entity getting the loan side, correct?

25 A    Yes, sir.

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

McClure - Cross by Mr. Engle

1  Q    That was the issue with the BDC that you had making the
2  loan to First Capital retail because if Mr. Singal still owned
3  First Capital Retail, then that would be a prohibited
4  transaction under the '40 Act and a civil violation of the U.S.
5  securities laws?
6  A    I can't speak to what type of violation it is, but clearly
7  it's prohibited underneath the '40 Act.
8  Q    Right.  And the '40 Act is part of the securities laws of
9  the United States, correct?
10  A    Yes, sir.
11  Q    I ask you that -- you have a law degree?
12  A    I do.
13  Q    So, you became aware, did you not, that in 2018 and 2019
14  the SEC launched an inquiry and ultimately filed a suit, civil
15  suit against Mr. Singal for prohibited transactions like this?
16  A    Yes, I'm aware.
17  Q    And you're aware that this loan, the BDC to the FCR loan,
18  was one of those transactions in which the Securities and
19  Exchange Commission said he violated the '40 Act because when
20  the loan occurred he still owned FCR, right?
21        MR. FOGG:  Objection, Your Honor.
22        THE COURT:  On what basis?
23        MR. FOGG:  Hearsay.
24        MR. ENGLE:  The witness has personal knowledge of the
25  investigation in the matter.  He was subpoenaed to testify.

Prasad - Direct by Fogg

1    A    That this would be the note that I would be carrying,

2    and -- until the BDC would absorb the company.

3    Q    You used a few words there I don't know if I fully

4    understand, so let me ask you to clarify.  When you say "note"

5    in that context, what does note mean?

6    A    It's a promissory note, it's a promise to pay $11.5

7    million for the purchase of all the locations of Cinnabon.

8    Q    What does it mean to carry a note?

9    A    That no payment was due at that point in time.

10   Q    And could you look at the last page of this document.

11        MR. FOGG:  And, Ms. Kenny, could you go to the last

12   page, please.  Could you blow up the "Signature" block, please.

13   BY MR. FOGG:

14   Q    Mr. Prasad, who is listed as "Borrower" on the last page

15   of Exhibit 102?

16   A    It's my name.

17   Q    Do you recognize the signature?

18   A    Yes.

19   Q    Whose signature is it?

20   A    That's mine.

21        MR. FOGG:  Could we go back to the first page, please,

22   Ms. Kenny.  Could we expand -- could we blow up everything from

23   that line up from the page, please.  Perfect, thank you.

24   BY MR. FOGG:

25   Q    Looking at the top right corner of the first page of

Prasad - Direct by Fogg

1    Exhibit 102, what's the date listed in that corner?

2    A    February 23, 2017.

3    Q    Did you sign this document in February 23, 2017, or did

4    you sign the Promissory Note on some later date?

5    A    I believe I signed it at a later date.

6    Q    Do you remember when you signed?

7    A    Not specifically.

8    Q    But you signed it some day after February 23, 2017?

9    A    Yes.

10   Q    When you signed the Membership Interest Purchase

11   Agreement, Exhibit 101, did you think you needed to provide the

12   Promissory Note for your ownership -- to gain ownership of FCR?

13   A    No.

14   Q    Why not?

15   A    Because I didn't understand it to be like that at that

16   point.

17   Q    When you signed the Membership Interest Purchase

18   Agreement, did anyone tell you you needed to provide the

19   Promissory Note to complete the sale?

20   A    No.

21   Q    And Exhibit 102, who prepared that document?

22   A    Tony Arostegui, and I believe Suneet told him to prepare

23   it or have something written up.

24   Q    Did you pick the date, February 23, 2017, on this

25   document?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Prasad - Direct by Fogg

1    A    No.

2    Q    When did you first become aware of this Promissory Note?

3    A    I don't recall exactly when.

4    Q    Did someone ask you to sign it?

5    A    Yes.

6    Q    Can you tell me a little bit about what -- the

7    circumstances of someone asking you to sign this Promissory

8    Note?

9    A    The circumstance is not very clear, but I was asked to get

10   this signed and delivered.  There was a need for it.

11   Q    Who asked you to sign and deliver it?

12   A    Suneet.

13   Q    And how did you know -- what need was there for the

14   Promissory Note?

15   A    I don't know exactly what the need was, but I think --

16   Q    Do you remember approximately when that was?

17   A    Not off the top of my head, no.

18   Q    Is that because it's 2025, we're talking about events in

19   2017?

20   A    Yes, a lot has happened since, yes.

21        MR. FOGG:  Ms. Kenny, could you pull down 102, please.

22   BY MR. FOGG:

23   Q    Mr. Prasad, could you turn to Exhibit 103, please, in that

24   binder.

25        Do you see Exhibit 103 in that binder?

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

Prasad - Direct by Fogg

1    Q    Do you know why the BDC Loan Agreement, 106, was dated the

2    day after the Membership Interest Purchase Agreement, 101?

3    A    That would be the time that they could loan First Capital

4    Retail the money without causing conflict of interest.

5    Q    You said "conflict of interest." Did you talk to

6    Mr. Singal about a conflict of interest regarding the BDC?

7    A    Yes.

8    Q    What did he tell you?

9    A    That he cannot lend money to himself.

10   Q    Did he tell you why?

11   A    Because it would be a conflict of interest.

12        MR. FOGG:  Ms. Kenny, can we go back out, please, and

13   the first -- Paragraph E, please.

14   BY MR. FOGG:

15   Q    Mr. Prasad, how much was this BDC loan to FCR for?

16   A    1,500,000.

17        MR. FOGG:  Ms. Kenny, could we go back out and go to

18   the last page of the agreement, please.  I appear to have given

19   you a bum steer.  How about one page before that, please, and

20   the one before that.  Okay.  There we go.

21   BY MR. FOGG:

22   Q    Mr. Prasad, do you see what is now the third-from-the-last

23   page of Exhibit 106 on the screen in front of you?

24   A    Yes.

25   Q    Do you see the "Signature" block that says "Borrower"?

Prasad - Direct by Fogg

1  A    Yes.

2        MR. FOGG:  Ms. Kenny, can you expand that please.

3  BY MR. FOGG:

4  Q    Whose name is listed as "Borrower"?

5  A    First Capital Retail, LLC.

6  Q    Who signed for First Capital, LLC?

7  A    Myself.

8  Q    I misspoke.  Who signed for First Capital Retail, LLC?

9  A    Myself, Ramesh Prasad.

10 Q    Do you recognize your signature?

11 A    Yes.

12 Q    What title did you use?

13 A    President.

14 Q    When you bought FCR -- strike that.  Let me ask that

15 differently.

16      When you signed this loan agreement, did you believe that

17 you owned FCR?

18 A    Yes.

19 Q    Why did you use the title "president" even though you had

20 bought FCR?

21 A    It was still under First Capital Retail, LLC, so as

22 president I would be running it.

23 Q    Did you think you needed to change your title?

24 A    No.

25        MR. FOGG:  Your Honor, I'm at a point where I'm

MARYANN VALENOTI - U.S. DISTRICT COURT -  (916)930-4275

1  changing subjects.  I'm happy to move on if you want to go

2  until 4:30.

3          THE COURT:  No, we can stop there.  So members of the

4  jury, we're going to stop there, so I will let you go for the

5  day.  We'll start back tomorrow at 9 a.m.  Please remember the

6  admonition.  Don't discuss the case with anybody else.  Don't

7  do any research on the Internet.  That includes talking to each

8  other, talking to your family, your friends.  Just enjoy your

9  evening.  We'll see you tomorrow at 9 o'clock, and thank you

10  all for your attention today.

11          (In open court outside the presence of the jury.)

12          THE COURT:  You can step down, sir, and the rest of

13  you can sit.

14          Anything from the government that we need to address?

15          MR. FOGG:  Yes, Your Honor, a scheduling update.  I'll

16  just wait for the witness to leave the room first.

17          THE COURT:  Okay.

18          MR. FOGG:  We have the witness out of the room.  I can

19  report good news, Your Honor, on the progress of the

20  government's case.  I think it's possible the government would

21  be prepared to rest tomorrow.

22          THE COURT:  Okay.

23          MR. FOGG:  We're about two thirds of the way through

24  Mr. Prasad's direct examination, and after that we have an FBI

25  accountant, one more merchant lender and then Cindy Campbell