# EXHIBIT D
# Gov. Ex. 101

# MEMBERSHIP INTEREST PURCHASE AGREEMENT

This Membership Interest Purchase Agreement (this "**Agreement**"), is made effective as of _2/23_____, 2017 ("**Closing Date**"), by and among Ramesh Prasad *[for a limited liability company majority owned and controlled by Ramesh Prasad]* ("**Buyer**"), and First Capital Real Estate Investments, LLC, a California limited liability company (the "**Seller**"), and First Capital Retail, LLC, a California limited liability company (the "**Company**"). Buyer, Seller and Company, respectively, is referred to herein individually as a "**Party**" and, collectively, as the "**Parties**." Terms not defined herein shall have the meanings ascribed to them in **Exhibit A** attached hereto.

WHEREAS, Seller owns a One Hundred Percent (100%) percentage ownership interest in the Company (the "**Seller Units**");;

WHEREAS, Seller desires to sell the Seller Units to Buyer and Buyer desires to purchase the Seller Units from Seller pursuant to the terms of this Agreement; and

NOW, THEREFORE, in consideration of the foregoing and of the mutual agreements, covenants, representations and warranties hereinafter contained, the Parties agree as follows:

## ARTICLE 1. PURCHASE AND SALE OF MEMBERSHIP INTEREST.

1.1    <u>Purchase and Purchase Price</u>.  At the Closing, the Seller shall sell to the Buyer, and the Buyer shall purchase from the Seller, all of the Seller Units.  In consideration for the sale, conveyance, transfer and delivery to the Buyer of the Seller Units, the Buyer shall pay Seller the principal sum of Eleven Million Five Hundred Thousand Dollars ($11,500,000.00) (the "**Purchase Price**").

1.2    <u>Payment of Purchase Price</u>.  At the Closing, the Buyer shall deliver to Seller a promissory note to Seller in the amount of the Purchase Price in substantially the form of **Exhibit B** attached hereto (the "**Promissory Note**").  The Promissory Note shall provide for interest at the rate of six (6%) percent per annum, interest to be deferred until maturity (twelve (12) months following execution of the Promissory Note subject to two (2) thirty day extensions subject to a concurrent payment of an extension fee in the amount of Ten Thousand Dollars ($10,000.00) for each extension which fee shall be non-refundable and non-applicable to the Purchase Price.

1.3    <u>Security for Promissory Note</u>.  The Promissory Note shall be secured by the following documents and instruments, which the Buyer shall deliver or cause to be delivered at the Closing:

1.3.1    a pledge agreement in substantially the form attached as **Exhibit C** ("**Pledge Agreement**") executed by Buyer, with the Seller as the secured party, granting to Seller a perfected first priority security interest in the Total Units to secure the obligations of the Buyer under the Transaction Documents;

SINGAL_00000400

GOVERNMENT'S
EXHIBIT
**101**
2-22-CR-00068-DJC

Ex. D-002

1.3.2    Intentionally deleted.

1.3.3    Buyer shall purchase or shall cause Company to purchase and maintain life and disability buyout insurance policies ("**Insurance Policies**") on Ramesh Prasad for the benefit of Seller with the coverages, terms and conditions as set forth in Section 5.6;

1.3.4    a guaranty agreement in substantially the form attached as **Exhibit E** ("**Company Guaranty**") executed by the Company in favor of Seller guarantying payment and performance of Buyer' obligations under the Transaction Documents; and

1.3.5    a security agreement in substantially the form attached as **Exhibit F** ("**Security Agreement**") executed by Company in favor of Seller granting to Seller a perfected security interest in all the assets of the Company to secure the payment and performance of the Company Guaranty and the Company's obligations under this Agreement.

## ARTICLE 2.  CLOSING.

2.1    <u>Time and Place</u>.  The closing of the purchase of the transactions contemplated by this Agreement ("**Closing**") shall be held at the offices of the Company on the Closing Date.

2.2    <u>Closing Obligations</u>.  At the Closing:

2.2.1    Seller shall deliver to Buyer:

(a)    The membership unit certificates representing the Seller Units, all duly endorsed in blank or accompanied by transfer papers duly endorsed in blank (but which will be physically held by the Seller pursuant to the Pledge Agreement); and

(b)    An executed Pledge Agreements and Security Agreement.

2.2.2    Buyer shall deliver or cause to be delivered to Seller:

(a)    an executed original of the Promissory Note;
(b)    an executed original of the Pledge Agreement;
(c)    an executed original of the Security Agreement;
(d)    an executed original of the Company Guaranty; and
(e)    Intentionally deleted.  .

## ARTICLE 3.  REPRESENTATIONS AND WARRANTIES OF THE SELLER.

Seller hereby represents and warrant to the Buyer as follows:

3.1    <u>Title to Units</u>.  The Seller is the legal and beneficial owner of record of the Seller Units and that except as may be disclosed in the financial records of the Company, and the delivery to the Buyer on the Closing Date of certificates for the Seller Units will convey to the

SINGAL_00000401

Gov. Ex. 101-002

Buyer legal, valid and indefeasible title thereto, free and clear of any Lien, other than Liens imposed pursuant to the terms of the Transaction Documents.

3.2    Necessary Authority.  The Seller has all requisite power and authority to enter into, deliver and perform this Agreement and to consummate the transactions contemplated herein.  The Seller have duly executed and delivered this Agreement, and this Agreement constitutes the legal, valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditors' rights generally now or hereafter in effect, and subject to the availability of equitable remedies.

3.3    Exclusive Representations and Warranties.  The provisions of this Article 3 state the sole and exclusive representations and warranties made by the Seller to the Buyer with respect to the subject matter of this Agreement and are in lieu of any and all other warranties, express or implied.

### ARTICLE 4.  REPRESENTATIONS AND WARRANTIES OF THE BUYER.

The Buyer hereby represents and warrant to the Seller as follows:

4.1    Necessary Authority.  The Buyer has all requisite power and authority to enter into, deliver and perform under the Transaction Documents and to consummate the transactions contemplated therein.  This Agreement has been duly executed and delivered by the Buyer and the other Transaction Documents when executed and delivered at the Closing shall constitute their valid and legally binding obligation, enforceable against the Buyer in accordance with their terms, except as the same may be limited by bankruptcy, insolvency, reorganization or other laws affecting the enforcement of creditors' rights generally now or hereafter in effect, and subject to the availability of equitable remedies.

4.2    No Conflicts.  The execution, delivery and performance of the Transaction Documents (including all related and incorporated agreements attached hereto) by the Buyer and the consummation of the transactions contemplated herein, do not and will not: (i) require the consent, approval, authorization, order, filing, registration or qualification of or with any court, Governmental Authority or third Person that has not heretofore been duly and validly obtained; (ii) conflict with or result in any violation of or default under any provision of any mortgage, indenture, lease, agreement or other instrument, permit, concession, grant, franchise or license to which the Buyer is a party or by which either or their properties are bound; or (iii) violate any law, ordinance, rule, regulation, judgment, order or decree applicable to the Buyer.

4.3    Ability to Perform.  The Buyer has the financial ability to perform their obligations under this Agreement and the other Transaction Documents and to consummate the transactions contemplated herein and therein in a timely manner.

4.4    Investment Intent and Knowledge.  The Buyer hereby represents that they are acquiring the Seller Units for investment only and not with a view to resale in connection with any distribution of the Seller Units, except in compliance with the Securities Act of 1933, as amended, and all other applicable federal and state securities laws.  The Buyer have such

SINGAL_00000402

Gov. Ex. 101-003

knowledge and experience in financial and business matters such that they are capable of evaluating the merits and risks of its investment in the Units and that they understand and are able to bear any economic risks associated with such investment and have been given the opportunity to ask questions of, and receive answers from, the Seller and the principal officers of the Company concerning the business and financial affairs of the Company. Representatives of the Buyer have been officers and directors of the Company, and as such, are familiar with all aspects of the business of the Company including its financial and tax matters.

4.5     Intentionally deleted.

4.6     No Material Adverse Change.  There has been no material adverse change in Buyer' financial condition or net worth. Buyer has no contingent obligations, liabilities for taxes, or other outstanding financial obligations that are material individually or in the aggregate.

4.7     Completeness of Statements.  No representation or warranty of the Buyer to the Seller pursuant hereto or in connection with the transactions contemplated hereby, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary in light of the circumstances to make the statements contained herein or therein not misleading.

4.8     Legal Proceedings.  No litigation, tax claim, proceeding, or dispute is pending or, to Buyer' knowledge, threatened against or affecting Buyer or their properties.

4.9     Disclosure of Information.  Buyer have had the opportunity to ask any and all questions they may have and receive answers thereto from Seller and the Company regarding the terms and conditions of this Agreement.

4.10    Exclusive Warranties.  Except for the representations and warranties made in the other Transaction Documents, the provisions of this Article 4 state the sole and exclusive warranties made by the Buyer to the Seller with respect to the subject matter of this Agreement and are in lieu of any and all other warranties, express or implied.

**ARTICLE 5. POST-CLOSING AFFIRMATIVE COVENANTS.**

From and after the Closing Date and for so long as the Purchase Price or any Obligation of the Credit Parties shall remain unpaid or unsatisfied, unless both Seller waive compliance in writing, the Buyer and the Company jointly and severally covenant and agree to:

5.1     Financial Statements and Tax Returns.  Deliver to the Seller, in form and detail satisfactory to the Seller:

5.1.1   as soon as available, but not later than ninety (90) days after the end of each calendar year, commencing with the 2016 calendar year, a copy of the balance sheet of the Company as at the end of such year and the related statements of income, shareholders' equity and cash flows for such year, setting forth in each case in comparative form the figures for the previous calendar year, and if there has occurred an un-cured breach by any of the Buyer under any Transaction Document, then such financial statements shall be accompanied by a review

SINGAL_00000403

Gov. Ex. 101-004

Ex. D-005

opinion of a Certified Public Accountant, acceptable to Seller ("**Independent Auditor**"), which report shall state that such financial statements present fairly the financial position for the periods indicated in conformity with GAAP applied on a basis consistent with prior years. Except as to the limitation of the scope of the opinion on account of the delivery of a review opinion rather than an audit opinion, such opinion shall not be qualified or limited because of a restricted or limited examination by the Independent Auditor of any material portion of the Company's records;

5.1.2    as soon as available, but not later than twenty (20) days after the end of each calendar month, commencing with April 2017, a copy of the unreviewed balance sheet of the Company as of the end of such calendar month and the related statements of income and shareholders' equity for the period commencing on the first day and ending on the last day of such month. In addition, Buyer and Company shall provide Seller with full access at all reasonable times to all Company information to the same extent that would be available to them if they were directors of the Company, and specifically including remote electronic access to the financial, banking and other information of the Company;

5.1.3    as soon as available, but in no event later than fifteen (15) days after the applicable filing date for the tax reporting period ended, federal, state and other income Tax Returns, prepared by a certified public accountant satisfactory to Seller; and

5.1.4    as soon as available, but in no event later than twenty (20) days after the end of each calendar month, an accounts payable aging report, accounts receivable aging report, and, if applicable, a work in progress report.

5.2    Certificates; Other Information.    Promptly furnish to the Seller and their representatives:

5.2.1    concurrently with the delivery of the financial statements and information referred to in Section 5.1, a compliance certificate signed by both Buyer in substantially the form attached hereto as **Exhibit G**; and

5.2.2    such additional information regarding the business, financial or corporate affairs of the Company and the Credit Parties as the Seller may from time to time request.

5.3    Notices.    Promptly notify the Seller:

5.3.1    of the occurrence of any Default and of the occurrence or existence of any event or circumstance for which it is reasonably foreseeable that it will become a Default, in each case after either Buyer knows or has reason to know of the occurrence thereof;

5.3.2    of (i) any breach or non-performance of, or any Default under, any Contractual Obligation of the Company; and (ii) any dispute, litigation, investigation, proceeding or suspension which may exist at any time between the Company and any Governmental Authority, which in each case, with respect to (i) and (ii), has resulted in or may result in a Material Adverse Effect;

SINGAL_00000404

Gov. Ex. 101-005

5.3.3  of the commencement of, or any material development in, any litigation or proceeding affecting the Buyer, the Company or any other Credit Party (i) in which the amount of damages claimed is Ten Thousand Dollars ($10,000.00) or more, (ii) in which injunctive or similar relief is sought and which, if adversely determined, may be expected to have a Material Adverse Effect, or (iii) in which the relief sought is an injunction or other stay of the performance of this Agreement or any other Transaction Document;

5.3.4  upon, but in no event later than ten (10) Business Days after, becoming aware of (i) any and all enforcement, cleanup, removal or other governmental or regulatory actions instituted, completed or threatened against the Company or any of their respective properties pursuant to any applicable Environmental Laws, (ii) all other Environmental Claims, and (iii) any environmental or similar condition on any real property adjoining or in the vicinity of the property of the Company that could be anticipated to cause such property or any part thereof to be subject to any restrictions on the ownership, occupancy, transferability or use of such property under any Environmental Laws; and

5.3.5  of any change in accounting policies or financial reporting practices by the Company.

Each notice under this Section 5.3 shall be accompanied by a written statement by the Buyer setting forth details of the occurrence referred to therein, and stating what action the Company proposes to take with respect thereto and at what time.  Each notice under subsection 5.3.1 shall describe with particularity any and all clauses or provisions of this Agreement or other Transaction Documents that have been (or foreseeably will be) breached or violated.

5.4    Preservation of Corporate Existence, Etc.  Cause the Company to:

5.4.1  preserve and maintain in full force and effect its corporate existence and good standing under the laws of its state of incorporation and states where it conducts business;

5.4.2  preserve and maintain in full force and effect all governmental rights, privileges, qualifications, permits, licenses and franchises necessary or desirable in the normal conduct of its business; and

5.4.3  use diligent, commercially reasonable efforts, in the ordinary course of business, to preserve its business organization and goodwill.

5.5    Maintenance of Property.  Maintain and preserve all of the Company's property which is used or useful in its business in good working order and condition, ordinary wear and tear excepted and make all necessary repairs thereto and renewals and replacements thereof except where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

5.6    Insurance.

SINGAL_00000405

Gov. Ex. 101-006

5.6.1   Maintain fire, property and casualty and specific risk insurance for its properties, public liability insurance, business interruption insurance, and such other insurance as Seller may require from time to time with respect to Company's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Seller. Upon the request of Seller, Company will deliver to Seller from time to time the policies or certificates of insurance in form satisfactory to Seller, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice (with the exception for ten (10) days written notice for non-payment of premium) to Seller. Each insurance policy also shall include an endorsement providing that coverage in favor of Seller will not be impaired in any way by any act, omission or default of Company or any other Person. In connection with all policies covering assets in which the Company offered a security interest to the Seller under the Security Agreement, Company shall provide Seller with lender's loss payable or other endorsements as Seller may require.

5.6.2   Furnish to Seller, upon request of Seller, reports on each existing insurance policy showing such information as Seller may reasonably request, including, without limitation, the following: (i) the name of the insurer; (ii) the risks insured; (iii) the amount of the policy; (iv) the properties insured; (v) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (vi) the expiration date of the policy.

5.6.3   Acquire and maintain at Company and Buyer sole expense life insurance and disability buy-out insurance, if available, (and with respect to such disability buy-out insurance, the annual premium cost need not exceed Ten Thousand Dollars ($10,000.00) indexed for the CPI starting in 2017) on Ramesh Prasad pursuant to such terms and conditions and with insurance companies all as may be acceptable to the Seller from time to time and in connection therewith, Seller shall obtain a perfected first priority securities interest in the proceeds of all such policies by way of assignment and the Buyer shall cooperate fully (including, without limitation, undertaking medical exams) so that such insurance policies may be obtained and maintained.

5.7   Payment of Obligations. Cause the Company to pay and discharge as the same shall become due and payable (or, in the case of real property taxes, before the same shall become delinquent):

5.7.1   all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings and adequate reserves in accordance with GAAP are being maintained by the Company; and

5.7.2   all lawful claims which, if unpaid, would by law become a Lien upon its assets or properties.

5.8   Compliance with Laws. Cause Company to comply, in all material respects with all Requirements of Law of any Governmental Authority having jurisdiction over it or its

SINGAL_00000406

Gov. Ex. 101-007

business, except such as may be contested in good faith or as to which a bona fide dispute may exist.

5.9    Compliance with ERISA.    (a) maintain each Employee Benefit Plan in compliance in all material respects with the applicable provisions of ERISA, the IRC and other federal or state law; (b) cause each pension plan which is qualified under Section 401(a) of the IRC to maintain such qualification; (c) make all required contributions to any pension plan subject to Section 412 of the IRC; and (d) not become subject to an ERISA Event. The 401(k) profit sharing plan of the Company shall be terminated as of December 31, 2016. The Company shall not adopt any Employee Benefit Plan without the prior written consent of the Seller, which consent may be withheld in the sole and absolute discretion. Buyer shall serve as the trustees of any Employee Benefit Plan adopted by the Company in compliance with this Section.

5.10    Inspection of Property and Books and Records.    Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of the Company. Permit, and the Buyer shall cause the Company to permit representatives and independent contractors of the Seller to visit and inspect any of their respective properties, to examine their respective corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss their respective affairs, finances and accounts with their respective directors, officers, and independent public accountants, at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Company; provided that, before the occurrence and the continuation of an Event of Default, such rights of visitation and inspection shall not be exercised by Seller more than once in any calendar quarter.

5.11    Environmental Laws.    Conduct the Company's operations and keep and maintain its property in compliance with all Environmental Laws in all material respects.

5.12    Further Assurances.    Promptly disclose to the Seller and, to the extent practicable, correct any material defect or error that may be discovered in any written information, exhibits and reports furnished to the Seller or in any other Transaction Documents or in the execution, acknowledgment or recordation thereof.

5.13    Net Worth.    Cause the Company to maintain, at the end of any calendar quarter, a minimum net worth equal to (a) Fifteen Million Dollars ($15,000,000.00) plus (b) 15% of cumulative positive net income for each calendar year beginning with 2017 (and without deduction for any losses in any calendar year). For purposes of this Section 5.13 only, wages, benefits and other similar payments collectively made to the Buyer and their Affiliates shall be included as reductions to net income only to the extent of *[$150,000.00]*, and net income of the Company shall mean the net income of the Company (determined in accordance with GAAP) less the amount of federal and state income tax liability of the Buyer arising solely on account of its status as a limited liability company after taking into account any interest deduction allowed or allowable to the Buyer with respect to the purchase of the Total Units (including interest paid on the Promissory Note) and any other business expenses of the Buyer properly reported as a deduction against income or a credit against tax relating to their ownership of the Total Units.

SINGAL_00000407

Gov. Ex. 101-008

5.14    Debt-Equity Ratio.  The Company shall maintain a Debt-to-Equity Ratio not in excess of 2 to 1 (i.e., liabilities not greater than 2 times its equity).  The term **"Debt-to-Equity Ratio"** means the Company's total liabilities divided by the Company's shareholders' equity determined in accordance with GAAP.

5.15    Intentionally Deleted.

5.16    Release of Liability.  Use their best efforts (which shall include submitting credit applications and personal guaranties) to cause all creditors, vendors and lenders of the Company to remove the Seller as guarantors of Company's debts within 120 days after Closing Date, and shall remove (within thirty (30) days after discovery) any other guaranties made by the Seller for Company's creditors, vendors and lenders that may later be discovered.  Not incur Company liabilities after the Closing Date for which Seller are liable under a guaranty provided by either Seller to any vendor, supplier or creditor of Company before the Closing Date.  Company and Buyer shall jointly and severally indemnify, defend (with counsel selected by Seller) and hold Seller harmless from any claim, liability or threat relating to any such guaranties, and from any and all liabilities, claims, losses and damages arising out of or relating to the Company whenever occurred and whenever arising.  On or before June 1, 2017, the Company shall send a notice (in the form acceptable to Buyer and Seller) to all vendors of the Company to the effect that Seller shall have no further liability under any guaranty and that new credit applications should be submitted to the Company.

5.17    Intentionally Deleted.

5.18    Material Contracts.  Cause the Company to perform its obligations and duties under the Material Contracts and refrain from undertaking any activity or failing to undertake any activity that would result in a breach of the Material Contracts or may cause Seller to incur liability.

5.19    Intentionally Deleted.

5.20    Contingent Payment.  In addition to the Purchase Price, Buyer shall pay Seller an additional amount pursuant to this Section 5.20, which if specified events occur, the amounts set forth below shall become immediately due and payable, and shall be deemed to be a joint and several obligation of Buyer and the Company:

5.20.1  If an event occurs (each, a **"Acquisition Transaction"**) that in substance, results in either (i) Buyer or any of their Affiliates receiving, directly or indirectly, cash, property or other consideration for or in respect of any the Total Units or any of the assets of business of the Company, or (ii) the Company directly or indirectly receives cash, property or other consideration for the issuance of any equity security or any debt instrument that has or may have any equity participation whatsoever (e.g., convertible debt, options, warrants, or high-rate debt) or debt issued outside the ordinary course of business (the items included in (i) and (ii) above being referred to collectively as each, a **"Sold Investment"**), then the Buyer shall pay to the Seller the Contingent Payment (as defined below), in addition to the Purchase Price, concurrent

SINGAL_00000408

*Gov. Ex. 101-009*

with and as a condition precedent to the effectiveness of any such Acquisition Transaction. If a Acquisition Transaction occurs and the amount of transaction consideration (which shall be adjusted downward but not upward to present value applying the then-applicable AFR under the IRC to any deferred payment obligation) received proportionately exceeds the Purchase Price per share or the portion of the Purchase Price reasonably or equitably allocable to Sold Investment (in each case, a "**Net Gain**"), then the Buyer shall pay to Seller twenty-five percent (25%) of the Net Gain (the "**Contingent Payment**") realized in connection therewith. The obligation to pay the Contingent Payment shall continue indefinitely until the Buyer and their Affiliates have sold for full consideration all of the Total Units to non-Affiliated persons (with no right to directly or indirectly repurchase) and no longer have any interest, directly or indirectly, in the Company.

       5.20.2 The term Acquisition Transactions shall be broadly interpreted to include, but not limited to, (i) sales of Business assets outside the ordinary course of business; (ii) issuance of stock or other securities for property or services; (iii) investment in a joint venture, limited liability company, partnership or other entity; (iv) distributions of borrowed funds; (v) receipt of insurance proceeds from or relating to any of the foregoing, and (vi) sales of any of the Total Units. A transaction will be considered to have occurred for purposes of this Paragraph 5.20.2 on the earlier of (i) the date the Buyer, their Affiliates, or the Company as the case may be, has entered into a binding obligation to undertake any Acquisition Transaction or (ii) the closing date of the Acquisition Transaction. Neither the Purchase Price nor any previous or subsequent Contingent Payment will be reduced if the Buyer, their Affiliates or the Company engage in an Acquisition Transaction that results in a net loss. If an Acquisition Transaction occurs as a consequence of a gift, a transfer for inadequate consideration or not at arms-length, the Acquisition Transaction consideration shall be deemed to be the fair market value of the Sold Investment on the date of the Acquisition Transaction without taking into account minority interest, lack of control or other discounts of any sort. Within five (5) Business Days prior to the occurrence of an Acquisition Transaction, Buyer shall deliver to Seller a notice identifying the Acquisition Transaction, the date the Acquisition Transaction is to occur, the Transaction Consideration, the Net Gain, and the amount of the Contingent Payment. Buyer agree not to report (for any purpose) any portion of the Contingent Payment obligation as an adjustment to basis or as additional consideration paid (whether as interest, principal or otherwise) to the Seller until such time as the a Contingent Payment is actually made, at which time such payment shall be classified as specified by the Seller.

## ARTICLE 6. POST-CLOSING NEGATIVE COVENANTS.

       From and after the Closing Date and for so long as Purchase Price or any Obligation of the Credit Parties shall remain unpaid or unsatisfied, unless both Seller waive compliance in writing, the Buyer and the Company jointly and severally covenant and agree not to:

       6.1   <u>Limitation on Liens</u>. Permit the Company to directly or indirectly make, create, incur, assume or suffer to exist any Lien upon or with respect to any part of its property, whether now owned or hereafter acquired, other than the following:

       6.1.1   any Lien existing on property of the Company for borrowed money from financial institutions (permitted pursuant to Section 6.6.3) not in excess of One Hundred

SINGAL_00000409

*Gov. Ex. 101-010*

Thousand Dollars ($100,000.00) and only where such borrowed funds are used in the ordinary course of the Company's business;

6.1.2    any Lien created under any Transaction Documents;

6.1.3    Liens for taxes, fees, assessments or other governmental charges which are not delinquent or remain payable without penalty, or to the extent that non-payment thereof is permitted by Section 5.7;

6.1.4    carriers', warehousemen's, mechanics', landlords', materialmen's, repairmen's or other similar Liens arising in the ordinary course of business securing amounts which are not delinquent or remain payable without penalty or which are being contested in good faith and by appropriate proceedings, which proceedings have the effect of preventing the immediate forfeiture or sale of the property subject thereto;

6.1.5    Liens consisting of pledges or deposits required in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation;

6.1.6    Liens securing (i) the non-delinquent performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, (ii) contingent obligations on surety and appeal bonds, and (iii) other non-delinquent obligations of a like nature; in each case, incurred in the ordinary course of business, provided that all such Liens in the aggregate would not (even if enforced) cause or result in a Material Adverse Effect;

6.1.7    Liens consisting of judgment or judicial attachment liens, provided that the enforcement of such Liens is effectively stayed and all such liens in the aggregate at any time outstanding for the Company do not exceed Ten Thousand Dollars ($10,000.00);

6.1.8    easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the businesses of the Company;

6.1.9    purchase money security interests on any property acquired or held by the Company in the ordinary course of business, securing Indebtedness incurred or assumed for the purpose of financing any part of the cost of acquiring such property; provided that (i) any such Lien attaches to such property concurrently with or within twenty (20) days after the acquisition thereof, (ii) such Lien attaches solely to the property so acquired in such transaction, (iii) the principal amount of the debt secured thereby does not exceed 70% of the cost of such property, and (iv) the principal amount of the Indebtedness secured by any and all such purchase money security interests shall not at any time exceed that permitted under Section 6.6.4; and

6.1.10    Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights and remedies as to deposit accounts or other funds maintained with a creditor depository institution; provided that (i) such deposit

SINGAL_00000410

Gov. Ex. 101-011

account is not a dedicated cash collateral account and is not subject to restrictions against access by the Company, and (ii) such deposit account is not intended by the Company to provide collateral to the depository institution.

6.2    <u>Disposition of Assets</u>.  Permit the Company to directly or indirectly sell, assign, lease, convey, transfer or otherwise dispose of (whether in one or a series of transactions) any Company property (including accounts and notes receivable, with or without recourse) or enter into any agreement to do any of the foregoing, except:

      6.2.1    Any dispositions of inventory in the ordinary course of business; and

      6.2.2    Any dispositions of equipment and other tangible assets in the ordinary course of business and for fair market value (and subject to the mandatory prepayment requirements of the Promissory Note).

6.3    <u>Consolidations and Mergers</u>.  Permit the Company to merge, consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

6.4    <u>Continuity of Operations</u>.  Permit the Company to (a) engage in any business activities substantially different than those in which Company is engaged as of the Closing Date, (b) cease operations, liquidate, change its name, or dissolve, or (c) change its principal executive office outside of the greater Sacramento metropolitan area.

6.5    <u>Loans and Investments</u>.  Permit the Company to purchase or acquire, or make any commitment therefor, any capital stock, equity interest, or any obligations or other securities of, or any interest in, any Person, or make or commit to make any Acquisitions, or make or commit to make any advance, loan, extension of credit or capital contribution to or any other investment in, any Person including any Affiliate of the Buyer or the Company (together, **"Investments"**), except for:

      6.5.1    Investments in the form of cash equivalents or short term marketable securities; and

      6.5.2    Extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business.

6.6    <u>Limitation on Indebtedness</u>.  Permit the Company to create, incur, assume, suffer to exist, or otherwise become or remain directly or indirectly liable with respect to, any Indebtedness, except:

      6.6.1    Indebtedness incurred pursuant to the Transaction Documents;

      6.6.2    Indebtedness consisting of Contingent Obligations permitted pursuant to Section 6.8;

SINGAL_00000411

Gov. Ex. 101-012

6.6.3    Indebtedness existing on the Closing Date and any renewals, extensions or modifications thereof so long as the aggregate amount of such Indebtedness does not exceed One Hundred Thousand Dollars ($100,000.00) and where the proceeds thereof are used in the ordinary course of the Company's business;

6.6.4    Purchase money Indebtedness secured by Liens permitted by subsection 6.1.9 in an aggregate amount outstanding not to exceed One Hundred Thousand Dollars ($100,000.00) at any point in time and where such assets are used in the ordinary course of the Company's business; and

6.6.5    Other Indebtedness incurred in the ordinary course of business (e.g., trade payables), provided that the amount of such Indebtedness outstanding at any point in time does not exceed One Hundred Thousand Dollars ($100,000.00)

6.7    <u>Transactions with Affiliates</u>.    Permit the Company to enter into, directly or indirectly, any transaction with any Buyer (other than normal and customary wages, salaries and benefits permitted by this Agreement) or any Affiliate of the Buyer.

6.8    <u>Contingent Obligations</u>.    Permit the Company to create, incur, assume or suffer to exist any Contingent Obligations except:

6.8.1    Endorsements for collection or deposit in the ordinary course of business;

6.8.2    Contingent Obligations which are part of the Obligations;

6.8.3    Contingent Obligations of the Company existing as of the Closing Date and any renewals, extensions or modifications thereof so long as the aggregate amount of such Contingent Obligations does not exceed Ten Thousand Dollars ($10,000.00); and

6.8.4    Guaranties by the Company of Obligations of the Buyer made pursuant to the Transaction Documents.

6.9    <u>Joint Ventures</u>.    Permit the Company to enter into any Joint Venture.

6.10    <u>Restricted Employment and Dividend Payments</u>.    Permit the Company to (i) make payments directly or indirectly to the Buyer or their Affiliates for goods or services, or (ii) declare or make any dividend payment or other distribution of assets, properties, cash, rights, obligations or securities on account of any Units of any class of its capital stock or of any other equity interest, or purchase, redeem or otherwise acquire for value any Units of its capital stock or other equity interests or any warrants, rights or options to acquire such Units or other equity interests, now or hereafter outstanding.    Notwithstanding the foregoing, and only so long as no Event of Default has occurred and is continuing:

6.10.1    Intentionally deleted;

SINGAL_00000412

Gov. Ex. 101-013

6.10.2  dividend distributions made to Buyer (i) in an amount to pay the periodic payments required under the Promissory Note, provided such dividend distributions are made to Buyer no more than five (5) Business Days prior to the due date of such periodic payments, or if the payment is being made prior to the due date, payment shall be made within five (5) calendar days of such distribution, and (ii) dividend distributions made to Buyer in an amount necessary to pay the policy premiums for the life and disability insurance policies required to be maintained pursuant to Section 5.6 if such policies are maintained by the Buyer rather than the Company;

6.10.3  provided, however, that the Company may make periodic wage payments to the Buyer in the annual aggregate amount of One Hundred Fifty Thousand Dollars ($150,000.00) (paid ratably pursuant to the Company's standard payroll practices for employees);

6.10.4  Buyer may cause the Company to increase their periodic wage payments and may increase the distributions made to them provided that the Buyer and the Company are in full compliance with each and every other warranty, representation, covenant and obligation under all of the Transaction Documents;

6.10.5  Notwithstanding the foregoing, with the prior written consent of Seller, Company may make additional dividend distributions.  Buyer will provided Seller with a summary and supporting documentation reconciling the dividends/distributions and other payments received by them with the dividends/distributions and wages allowed by this Section within ten (10) Business Days after Buyer file their annual federal income tax, and in no event later than August 25 of each year; and

6.10.6  Notwithstanding anything to the contrary in this Agreement, the Company shall not and the Buyer shall not cause the Company to make or issue distributions the proceeds of which were from Indebtedness unless such proceeds are immediately paid over Seller.

6.11    <u>Accounting Changes</u>.  Permit Company to make any significant change in accounting treatment or reporting practices, except as required by GAAP, or change the calendar year of the Company.

6.12    <u>Capital Expenditures</u>.  Permit the Company's Capital Expenditures to exceed One Hundred Thousand Dollars ($100,000.00) in any calendar year.

6.13    <u>Material Contracts</u>.  Permit the Company to consent to any amendment, modification, supplement, waiver or termination of any of the provisions of any Material Contract, if as a result thereof such contract would be materially less advantageous to the Company taken as a whole or result in or cause any liability for Seller.

6.14    <u>Limitation on Voluntary Payments of Debt</u>.  Permit the Company to make any voluntary or optional payment or prepayment on or redemption or acquisition for value of (including, without limitation, by way of depositing with the trustee, with respect to any Indebtedness of the Company, money or securities before such Indebtedness is due for the

SINGAL_00000413

*Gov. Ex. 101-014*

purpose of paying such Indebtedness when due) any Indebtedness of the Company other than (i) the Principal Amount, (ii) Indebtedness secured by equipment or real property where the total amount of all such Indebtedness prepaid in any calendar year does not exceed $30,000.00; (iii) the current portion (as determined by GAAP) of any other long-term debt of the Company provided that the amount of all such Indebtedness prepaid in any calendar year does not exceed $30,000.00, and (iv) normal and customary repayments of principal and interest on the Company's line of credit in the ordinary course of business, (v) insurance proceeds received on account of the damage or destruction of Company equipment provided that such insurance proceeds are paid to the lender who provided secured financing for such equipment and such prepayment to the lender shall not exceed the amount of the lender's secured debt in such destroyed or damaged equipment, and (vi) payments made before the due date to take advantage of customary trade discounts provided by vendors.    This Section shall not prohibit any refinancing or refunding of any Indebtedness of the Company prior to the maturity thereof so long as, after giving effect to such refunding or refinancing, the average life thereof is not decreased.

6.15    <u>Modifications of Debt</u>.    Permit the Company to consent to any amendment, modification, supplement, waiver or termination of any of the provisions of any Indebtedness exceeding Ten Thousand Dollars ($10,000.00) in outstanding principal amount.

6.16    <u>Organizational Documents</u>.    Permit the Company to amend or modify its articles other than to change the Company's name, in which case, Seller shall first be provided with ten (10) Business Days' advance written notice thereof.

6.17    <u>No Transfer</u>.    Transfer, convey, assign, pledge or create any Lien on any of the Total Units by agreement, by operation of law, or otherwise, and the stock certificates received by Buyer representing the Total Units (or any other certificates received by the Buyer in the future) shall bear a legend in the form acceptable to Seller to such effect.

## ARTICLE 7. INDEMNIFICATION.

7.1    <u>Indemnification of Seller</u>.    Subject to the provisions of Article 7, the Buyer, jointly and severally, agree to indemnify, defend (with counsel selected by Seller) and hold harmless the Seller and their agents, representatives and their Affiliates (collectively, "**Seller Indemnified Parties**") from and against any and all costs, losses, claims, liabilities, fines, penalties, damages and expenses, including, without limitation, interest which may be imposed in connection therewith, court costs or investigations and reasonable attorneys' fees incurred by the Seller Indemnified Parties in connection with: (i) any inaccuracy in or breach of any representation or warranty of the Buyer or Company made in this Agreement; (ii) any breach by the Buyer or the Company of any covenant or obligation contained in this Agreement; and (iii) any action, suit, proceeding, compromise, settlement, assessment or judgment arising out of or incident to any of the matters indemnified against in this Section 7.1.

7.2    <u>Indemnification of Buyer</u>.    Subject to the provisions of Article 7, the Seller, jointly and severally, agree to indemnify, defend and hold harmless the Buyer and their agents, representatives and their Affiliates (collectively, "**Buyer Indemnified Parties**") from and against any and all costs, losses, claims, liabilities, fines, penalties, damages and expenses,

SINGAL_00000414

Gov. Ex. 101-015

including, without limitation, interest which may be imposed in connection therewith, court costs or investigations and reasonable attorneys' fees incurred by the Buyer Indemnified Parties in connection with: (i) any inaccuracy in or breach of any representation or warranty of the Seller made in this Agreement; (ii) any breach by the Seller of any covenant or obligation contained in this Agreement; and (iii) any action, suit, proceeding, compromise, settlement, assessment or judgment arising out of or incident to any of the matters indemnified against in this Section 7.2.

    7.3   <u>Survival</u>. All of the Seller's representations and warranties in Article 3 and all of the Buyer's representations and warranties in Article 4 shall survive the Closing and continue thereafter. All covenants of the Parties made in this Agreement shall survive the Closing and continue thereafter.

    7.4   <u>Procedure</u>.

       7.4.1   If a Party wishes to make a claim for indemnification under this Article 7, the Party seeking indemnification ("**Indemnified Party**") shall give written notice ("**Claim Notice**") to the Party from which indemnification is sought ("**Indemnifying Party**") of the matter with respect to which the Indemnified Party seeks to be indemnified ("**Claim**"). The Claim Notice shall state the nature of the Claim and, if known, the amount of the loss, cost or expense. If the Claim arises from a claim of a third party, the Indemnified Party shall give such Claim Notice within a reasonable time after receipt of actual notice of such Claim, and in the event that a suit or other proceeding is commenced, within ten (10) days after receipt of written notice of such suit or other proceeding. If the Claim arises from the claim or demand of a third party, the Indemnifying Party shall have the right to defend any such Claim (with counsel acceptable to the Indemnified Party). The Indemnifying Party may elect, at the Indemnifying Party's option, to seek to join as party it its own right in the defense of any claim, action or proceeding brought against Indemnified Party. Failure by the Indemnifying Party to notify the Indemnified Party of the Indemnifying Party's election to defend any such Claim within ten (10) days after receipt of the Claim Notice (or the failure within such time to actually assume the defense of litigation commenced against Indemnified Party) shall be deemed a waiver by the Indemnifying Party of the Indemnifying Party's right to defend such Claim. If the Indemnifying Party shall not so notify the Indemnified Party of the Indemnifying Party's election to defend any Claim (and, in the case of litigated Claims, actually assume the defense of such Claim), the Indemnified Party may defend against such Claim in such manner as it may deem appropriate, and may settle such Claim on such terms as it may deem appropriate and the amount of the settlement and all reasonable and proper expenses of settling such Claim shall be chargeable to the Indemnifying Party. If no settlement of such Claim is made, the Indemnifying Party shall be chargeable for the amount of any judgment rendered with respect to such Claim and for all expenses, legal or otherwise, incurred by the Indemnified Party in the defense of such Claim. If the Indemnifying Party elects to defend any such Claim, the Indemnifying Party shall pay any expenses of the Indemnified Party in connection therewith and shall pay any judgment, damage or other liability arising from such Claim or the settlement thereof. The Indemnifying Party and the Indemnified Party shall cooperate in reasonable requests for documents, testimony and other forms of assistance in connection with any Claim. The Indemnifying Party shall not, in the defense of any such Claim, consent to the entry of any judgment against or affecting the Indemnified Party (other than a judgment of dismissal on the merits and without costs) except

SINGAL_00000415

Gov. Ex. 101-016

with the written consent (which cannot be unreasonably withheld or delayed) of Indemnified Party, or enter into any settlement (except with the written consent of Indemnified Party) which does not include as an unconditional term thereof a full release of the Indemnified Party by the claimant or the plaintiff to the Indemnified Party in respect of such Claim.

7.4.2   If the Claim does not arise from the claim or demand of a third party, the Indemnifying Party shall have thirty (30) days after receipt of the written notice of such Claim to object to the Claim by giving written notice to the Indemnified Parties specifying the reasons for such objection or objections.  If the Indemnifying Party does not so object to the Claim, the total amount of the Claim shall be chargeable to the Indemnifying Parties.  If the Indemnifying Party objects to the Claim and the Parties are unable to settle any such dispute, then on written request of the Indemnifying Party or the Indemnified Party served on the other, the Claim shall be settled in accordance with Section 9.5.

7.5   Set-off.   The Buyer shall not be allowed to withhold from any payments (including, without limitation, payments on the Promissory Note) or other amounts owing to the Seller until either the Seller agree in writing to the settlement of the Claim or there is a final adjudication of the Claim against them under Section 9.5 of this Agreement (collectively, "**Final Settlement**").  Unless otherwise agreed to in writing by the Parties to a Claim, an allocation of a Final Settlement shall be made as follows:

7.5.1   If the successful Indemnified Party in the Final Settlement are the Buyer Indemnified Parties, the amount of the Final Settlement shall be deducted from the Principal Amount owed to the Seller under the Promissory Note and thereby reduce the Term (as that term is defined in the Promissory Note) of the Promissory Note while continuing to make the payments as provided in the Promissory Note.

7.5.2   If the successful Indemnified Party in the Final Settlement are the Seller Indemnified Parties, the amount of the Final Settlement shall be paid to Seller within thirty (30) days after the Final Settlement.

7.6   Nonexclusive Remedies.   The indemnification provisions set forth above are not exclusive and are in addition to any other rights and remedies available to the Parties.

## ARTICLE 8. TAX MATTERS.

8.1   Closing of the Books.   Seller and Buyer hereby agree to close the books of Company as of the close of business of the Closing Date.  Seller shall not receive any allocation of income or loss for any portion of 2017, and shall not receive a K-1 for any period after December 31, 2016.  Company, Seller and Buyer shall cooperate with each other in the prompt and timely filing of any and all tax related documents required to be filed arising out of the purchase and sale of the Total Units.

8.2   Preparation and Filing of Tax Returns.

8.2.1   Seller shall have the right and obligation to timely prepare and file, or cause to be timely prepared and filed, when due any tax return that is required to include the

SINGAL_00000416

Gov. Ex. 101-017

Ex. D-018

operations, ownership, assets or activities of Company for tax periods ending on or before the December 31, 2016.

8.2.2   Buyer shall have the right and obligation to timely prepare and file, or cause to be timely prepared and filed, when due, all tax returns that are required to include the operations, ownership, assets or activities of Company for any tax periods beginning after December 31, 2016.

8.2.3   Seller shall, on the one hand, or Buyer shall on the other, with respect to any tax return which such Party is responsible hereunder for preparing and filing, or causing to be prepared and filed, make such tax return and related work papers available for review by the other Party if the tax return (i) is with respect to taxes for which the other Party may be liable hereunder or under applicable tax law, or (ii) claim tax benefits which the other Party is entitled to receive hereunder.  The filing party shall use its reasonable best efforts to make tax returns available for review as required under this paragraph sufficiently in advance of the due date for filing such tax returns to provided the non-filing party with a meaningful opportunity to analyze and comment on such tax returns and have such tax returns modified before filing, accepting the position of the filing party unless such position is contrary to law or to the provision of Section 8.2.4.

8.2.4   Any tax return which includes or is based on the operations, ownership, assets or activities of the Company for any pre-closing period, and any tax return which includes or is based on the operations, ownership, assets or activities of Company for any post-closing period or any straddle period, shall be prepared in accordance with past tax accounting practices used with respect to the tax returns in questions (unless such past practices are no longer permissible under the applicable tax law), and to the extent any items are not covered by past practices (or in the event such past practices are longer permissible under the applicable tax law), in accordance with reasonable tax accounting practices selected by the filing party with respect to such tax return under this Agreement with the consent (not to be unreasonably withheld or delayed) of the non-filing party.  The Parties shall not file amended returns for any period ending on or before December 31, 2016 without the prior written approval of the other Party, which consent may be withheld by the Seller.

8.3   Tax Controversies; Assistance and Cooperation.

8.3.1   In the event any tax authority informs Buyer or Company of any notice of proposed audit, claim, assessment or other dispute concerning an amount of taxes with respect to which Seller may incur liability, Buyer shall promptly notify Seller of such matter.  Such notice shall contain factual information (to the extent known) describing any asserted tax liability in reasonable detail and shall be accompanied by copies of any notice or other documents received from any tax authority with respect to such matter.

8.3.2   The Seller shall control any audits, disputes, administrative, judicial or other proceedings related to taxes with respect to which they may incur liability to the taxing authority.

Execution Original
1473656.3

18

SINGAL_00000417

Gov. Ex. 101-018

8.3.3   Buyer shall not agree to settle any tax liability or compromise any claim with respect to taxes, which settlement or compromise may affect the liability of Seller for taxes, without Seller' written consent.

8.3.4   Buyer shall bear the expenses incurred in connection with audits and other administrative and judicial proceedings relating to taxes for which Buyer and/or their Affiliates are liable.  Likewise, Seller shall bear such expenses relating to taxes for which they are liable.

8.3.5   Seller on the one hand, and Buyer, on the other, shall cooperate (and cause their Affiliates to cooperate) with each other and with each other's agents, including accounting firms and legal counsel, in connection with tax matters relating to Company, including (i) preparation and filing of tax returns, (ii) determining the liability and amount of any taxes due or the right to and amount of any refund taxes, (iii) examinations of tax returns, and (iv) any administrative or judicial proceeding in respect of taxes assessed or proposed to be assessed.  Such cooperation shall include each Party making all information and documents in its possession relating to Company available to the other Party.  The Parties shall retain all tax returns, schedules, and work papers, and all material records and other documents relating thereto, until the expiration of the applicable statute of limitations (including, to the extent noticed by any party, any extensions thereof) of the tax period to which such tax returns and other documents and information relate.  Each of the Parties shall also make available to the other Party, as reasonably requested and available, personnel (including officers, directors, employees, and agents) responsible for preparing, maintaining, and interpreting information and documents relevant to taxes, and personnel reasonably required as witnessed as for purposes of providing information or documents in connection with any administrative or judicial proceeding relating to taxes.  Any information or documents provided under this Agreement shall be kept confidential by the Party receiving such information or documents, except as may otherwise be necessary in connection with the filing of tax returns or in connection with administrative or judicial proceedings relating to taxes.

## ARTICLE 9.  MISCELLANEOUS.

9.1   <u>Expenses</u>.  The Parties' respective costs and expenses (including all legal and accounting expenses) relating to the negotiations leading up to this Agreement and the Closing of the transactions contemplated herein, shall be paid by the Company.

9.2   <u>Notices</u>.  All notices, demands or other communications given hereunder shall be in writing and shall be sufficiently given if delivered by overnight delivery service or sent by registered or certified mail, first class, postage prepaid, personal delivery or similar written means of communication, addressed as follows:

If to the Seller:

With a copy to:

SINGAL_00000418

Gov. Ex. 101-019

Ex. D-020

If to Buyer or the Company:


With a copy to:



or such other address with respect to any Party hereto as such Party may from time to time notify (as provided above) to the other Party hereto. Any such notice, demand or communication shall be deemed to have been given if: (a) so mailed, as of the close of the third (3rd) Business Day following the date so mailed; and (b) if personally delivered on the date delivered.

9.3     Assignment, Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors, heirs and administrators, and permitted assigns.  No Party shall assign any of its rights or obligations hereunder without the prior written consent of the other Party with the sole exception being the Seller shall have the right to freely assign any and all rights and benefits they may have under the Promissory Note and the related security agreements.

9.4     Applicable Laws.   This Agreement shall be construed and governed by the internal laws, and not the law of conflicts, of California to agreements made and to be performed in California.

9.5     Dispute Settlement.  Any controversy or claim arising out of or relating to this Agreement, or the breach thereof (with the exception of any controversy or claim arising out of or relating to the other Transaction Documents, a dispute under which shall be settled according to the dispute settlement provisions contained therein), shall be brought against any of the Parties (without a jury) in the courts of the State of California, County of Sacramento, or, if it has or can acquire jurisdiction, in the United States District Court for the Northern District of California, and each of the Parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.  THE PARTIES HERETO WAIVE THEIR RIGHT TO A JURY TRIAL TO THE FULLEST EXTENT PERMITTED BY LAW WITH REGARD TO ANY CLAIM, ACTION OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS, OR OTHERWISE.

SINGAL_00000419

Gov. Ex. 101-020

9.6     Attorneys' Fees; Prejudgment Interest.  In the event of commencement of a claim by any Party to enforce the provisions of this Agreement, the prevailing party shall be entitled to receive such attorneys' fees and costs as may be adjudged reasonable in addition to any other relief granted.  Any award of damages as a result of the breach of this Agreement or any of its provisions shall include an award of prejudgment interest from the date of the breach at the maximum rate of interest allowed by law.

9.7     Entire Agreement.  This Agreement, together with the Exhibits attached hereto, constitutes the entire agreement among the Parties hereto, and no Party hereto shall be bound by any communications between them on the subject matter hereof unless such communications are in writing and bear a date contemporaneous with or subsequent to the date hereof.  Any prior written agreements or letters of intent among the Parties relating to the subject matter hereof shall, upon the execution of this Agreement, be null and void.

9.8     Amendments and Waivers.  No term or provision of this Agreement may be amended, waived, discharged or terminated orally but only by an instrument in writing signed by the Party against whom the enforcement of such amendment, waiver, discharge or termination is sought.  Any waiver shall be effective only in accordance with its express terms and conditions.

9.9     Severability.  Any provision of this Agreement which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions hereof, and any such unenforceability in any jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.  To the extent permitted by applicable law, the Parties hereby waive any provision of law now or hereafter in effect which renders any provision hereof unenforceable in any respect.

9.10     Headings.  The headings in the sections of this Agreement are inserted for convenience only and shall not constitute a part hereof or affect the meaning or interpretation hereof.

9.11     Construction.  No provision of this Agreement shall be construed against any Party on the ground that such Party or its counsel drafted the provision.

9.12     Counterparts.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

9.13     Time of Essence.  Time is of the essence.

9.14     No Third Party Beneficiaries.  This Agreement is solely for the benefit of the Seller and the Buyer and shall create no rights of any nature in any Person not a party hereto.

*SIGNATURES ON FOLLOWING PAGE*

SINGAL_00000420

*Gov. Ex. 101-021*

Ex. D-022

IN WITNESS WHEREOF, each of the Parties has executed this Agreement as of the Closing Date.

**SELLER:**

By: _____

Name: Suneet Singal
Title: Manager
First Capital Real Estate Investments, LLC

**BUYER:**

By: Ramesh Prasad _____

Title: President _____
First Capital Retail, LLC.

**COMPANY:**

By: _____
Name:
Title:

By: _____
Name:
Title:

Execution Original
14736563

22

SINGAL_00000421

Gov. Ex. 101-022