# EXHIBIT M
# Gov. Ex. 214

# KAHN
*You build it. We fund it.*

Contract ID#: _____
Sales Partner: _____

Agreement dated **05/17/2017** between Global Merchant Cash, Inc. ("GMC" or "Global Merchant Cash") and the Merchant listed below ("MERCHANT") (Month) (Day) (Year)

## MERCHANT INFORMATION

Merchant's Legal Name: **FIRST CAPITAL RETAIL LLC**

D/B/A: **FIRST CAPITAL RETAIL**    State of Incorporation / Organization: _____

Type of Entity (circle one)    Corporation    **Limited Liability Company**    Limited Partnership    Limited Liability Partnership    Sole Proprietorship

Physical Address: **2377 GOLD MEADOW WAY STE 100** City: **GOLD RIVER** State: **CA** Zip: **95670**

Contact Name: **SUNEET SINGAL** Contact Number: _____

Mailing Address: **512 ALTA VISTA CT** City: **EL DORADO HLS** State: **CA** Zip: **95762**

## PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant" or "Seller") hereby sells, assigns and transfers to GMC ("GMC" or "Buyer") (making GMC the absolute owner) in consideration of the funds provided ("Purchase Price" or "Purchased Receivables") specified below, all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" or "Future Receivables" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the amount specified below (the "Purchased Amount" or "Purchased Receivables") has/have been delivered by or on behalf of Merchant to GMC. MERCHANT ALSO HEREBY STATES THAT; BASED UPON MERCHANT'S CALCULATIONS AND EXPERIENCE IN OPERATING ITS BUSINESS, IT IS CONFIDENT THAT THE FUNDS TO BE OBTAINED FROM GMC IN EXCHANGE FOR THE PURCHASED RECEIVABLES WILL BE USED IN A MANNER WHICH WILL BENEFIT MERCHANT'S CURRENT AND FUTURE BUSINESS OPERATIONS AND THEREBY GENERATE GROSS MONTHLY RECEIPTS OF A SUM OF NO LESS THAN THE MINIMUM AMOUNT OF GROSS RECEIPTS ("MINIMUM GUARANTEED GROSS RECEIPTS") SPECIFIED BELOW.

The Purchased Amount shall be paid to GMC by Merchant's irrevocably directing and authorizing that there be <u>only one</u> depositing bank account, which account must be acceptable to, and pre-approved by, GMC (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") of the Merchant's settlement amounts due from each Transaction, until such time as GMC receives payment in full of the Purchased Amount. Merchant hereby authorizes GMC to ACH Debit the specified remittances from the merchant's Account on a daily basis and will provide GMC with all necessary access codes, account credentials, passwords and monthly bank statements. Merchant understands and agrees that it is responsible for ensuring that the specified percentage to be debited by GMC remains in the Account and will be held responsible for any fees incurred by GMC resulting from a rejected ACH attempt or an event of default. (See Appendix A) GMC is not responsible for any overdrafts or rejected transactions that may result from GMC's ACH debiting the specified amounts under the terms of this agreement. If for any reason, the amount debited from Merchant's accounts is greater or less than the agreed upon Specified Percentage, upon receipt of the Merchant's monthly bank statements on or about the eighteenth day of each month, GMC shall reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the specified percentage. GMC may, upon Merchant's request, adjust the amount of any payment due under this Agreement at GMC's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or any other agreement between GMC and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

Purchase Price: $ **$50,000.00** Purchased Amount: **$74,950.00** Minimum Guaranteed Gross Receipts (per month): $ **$534,288.46** Specified Percentage: **10** %

Daily ACH Calculated Amount ([Minimum Guaranteed Gross Receipts x Specified Percentage]/Business Days of the Calendar Month): $ **1499.00**

THE "MERCHANT AGREEMENT TERMS AND CONDITIONS" SET FORTH ON PAGE 2, THE "SECURITY AGREEMENT AND GUARANTY", THE "BUSINESS ADVANCE AND SECURITY AGREEMENT", AND THE ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.

**FOR THE MERCHANT (#1)**
By **SUNEET SINGAL** _____
(Print Name and Title)    (Signature)    → Sign Here

**FOR THE MERCHANT (#2)**
By _____
(Print Name and Title)    (Signature)    → Sign Here

**OWNER #1**
By **SUNEET SINGAL** _____
(Print Name)    (Signature)    → Sign Here

**OWNER #2**
By _____
(Print Name)    (Signature)    → Sign Here

**GLOBAL MERCHANT CASH, INC.**
By _____    Sales Associate Name: _____
(Company Officer)    (Signature)

To the extent set forth herein, each of the parties is obligated upon his, her or its execution of the Agreement to all terms of the Agreement, including the Additional Terms set forth below. Each of above-signed Merchant and Owner(s) represent that he or she is authorized to sign this Agreement for Merchant, legally binding said Merchant to repay this obligation and that the information provided herein and in all of GMC documents, forms and recorded interviews is true, accurate and complete in all respects. If any such information is false or misleading, Merchant shall be deemed in material breach of all agreements between Merchant and GMC, and GMC shall be entitled to all remedies available under law, equity and/or this Agreement. GMC may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant via Processor and/or Operator to GMC. An investigative or consumer report may be made in connection with the Agreement. Merchant and each of the above-signed Owners authorizes GMC, its agents and representatives and any credit reporting agency engaged by GMC, to (i) investigate any references given or any other statements or data obtained from or about Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as Merchant and/or Owners(s) continue to have any obligation owed to GMC as a consequence of this Agreement or for GMC's ability to determine Merchant's eligibility to enter into any future agreement with Company.

ANY MISREPRESENTATION MADE BY MERCHANT OR OWNER IN CONNECTION WITH THIS AGREEMENT MAY CONSTITUTE A SEPARATE CAUSE OF ACTION FOR FRAUD, INTENTIONAL MISREPRESENTATION AND/OR UNJUST ENRICHMENT IN WHICH EVENT GMC WILL BE ENTITLED TO THE RECOVERY OF NOT ONLY ITS LOSSES BUT ALSO PUNITIVE DAMAGES AND ALL OF ITS COSTS AND EXPENSES AND ITS REASONABLE LEGAL FEES.

64 Beaver Street, New York, NY 10004 Ph. (877) 851-3880 Fax (212) 981-9195

SINGAL_00006335

GOVERNMENT'S EXHIBIT
**214**
2-22-CR-00068-DJC

# MERCHANT AGREEMENT TERMS AND CONDITIONS

## I. TERMS OF ENROLLMENT IN PROGRAM

**1.1 Merchant Deposit Agreement.** Merchant shall execute an agreement (the "Merchant Deposit Agreement") acceptable to GMC with a Bank acceptable to GMC to obtain electronic fund transfer services for the Merchant's account at the Bank approved by GMC (the "Account"). Merchant shall provide GMC and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes GMC and/or its agent(s) to deduct from the Account the amounts owed to GMC for the receipts as specified herein and to pay such amounts to GMC. Merchant also hereby authorizes GMC to withdraw from the Account the specified percentages and/or sums by GMC debiting the account. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by GMC or not. This additional authorization is not a waiver of GMC's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which GMC did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of GMC.

**1.2 Term of Agreement.** This Agreement shall remain in full force and effect until the entire "Purchased Amount" is received by GMC as per the terms of this Agreement, however, at any point during the term of this Agreement, Merchant may terminate this Agreement upon ninety days' prior written notice (effective upon actual receipt) to GMC. The termination of this Agreement shall not affect Merchant's continuing obligation and responsibility to fully satisfy all outstanding obligations that are due to GMC simultaneously with the Notice of termination.

**1.3 Future Purchases.** GMC reserves the right to rescind the offer to make any purchase payments hereunder, in its sole and absolute discretion.

**1.4 Financial Condition.** Merchant and Guarantor(s) (as hereinafter defined and limited) authorize GMC and its agents to investigate their financial responsibility and history, and will provide to GMC any authorizations, bank or financial statements, tax returns, etc., as GMC deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. GMC is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

**1.5 Transactional History.** Merchant authorizes all of their banks and brokers to provide GMC with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program.

**1.6 Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Credit Card PROCESSOR(S), THEIR MEMBER BANKS AND GMC, THEIR OFFICERS, MANAGERS, OWNERS, AFFILIATES, EMPLOYEES, AGENTS, REPRESENTATIVES, ITS OFFICERS, DIRECTORS AND SHAREHOLDERS (THE "INDEMNITEES") AGAINST ALL LOSSES, DAMAGES, CLAIMS, LIABILITIES AND EXPENSES (INCLUDING REASONABLE ATTORNEY'S FEES) (COLLECTIVELY REFERRED TO AS "INDEMNIFIED AMOUNTS") INCURRED BY ANY OF THE INDEMNITIES AND ARISING OUT OF OR RESULTING FROM (I) ACTIONS TAKEN IN RELIANCE UPON INFORMATION OR INSTRUCTIONS PROVIDED TO GMC AND/OR THE CREDIT CARD PROCESSORS AND THEIR MEMBER BANKS BY OR ON BEHALF OF MERCHANT, OR (II) THE OCCURRENCE OF A DEFAULT EVENT, AS HEREINAFTER DEFINED. IN NO EVENT WILL THE INDEMNITEES BE LIABLE FOR ANY CLAIMS ASSERTED AGAINST THEM BASED ON ANY THEORY OF LAW OR EQUITY FOR LOST PROFITS, REVENUES, OR BUSINESS OPPORTUNITIES, EXEMPLARY, SPECIAL, OR CONSEQUENTIAL DAMAGES, EACH OF WHICH IS HEREBY EXPRESSLY WAIVED BY MERCHANT. HOWEVER, IN THE EVENT THAT ANY INDEMNITEE SHALL BE FOUND LIABLE, DAMAGES SHALL NOT EXCEED THE SPECIFIED AMOUNT UNDER ANY CIRCUMSTANCE.

**1.7 No Liability.** In no event will GMC be liable for any claims asserted by Merchant or Guarantors under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s). In the event these claims are nonetheless raised, Merchant and Guarantors will be jointly liable for all of GMC's legal fees and expenses resulting therefrom.

**1.8 Reliance on Terms.** Section 1.1, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, GMC and Processor, and notwithstanding the fact that Processor is not a party of this Agreement, Processor may rely upon their terms and raise them as a defense in any action.

**1.9 Sale of Receipts.** Merchant and GMC agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from GMC to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. GMC has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Payments made to GMC in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers in the manner provided in Section 1.1. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest,- it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that GMC has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and GMC shall promptly refund to Merchant any interest received by PCVR in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that GMC not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

**1.10 Power of Attorney.** Merchant irrevocably appoints GMC as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to GMC from Processor, or in the case of a violation by Merchant of Section 1.12 or the occurrence of an Event of Default under Section 4 hereof, from Merchant, under this Agreement, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to GMC; and (v) to file any claims or take any action or institute any proceeding which GMC may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by and from Merchant, and GMC is authorized to use Merchant's funds to pay for same.

**1.11 Protections against Default.** The following Protections 1 through 7 may be invoked by GMC immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the GMC electronic check processor; (b) Merchant changes its arrangements with Processor in any way that is adverse to unacceptable to GMC; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant interrupts the operation of this business (other than adverse weather, natural disasters or acts of God) transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of GMC, and ( ii) the written agreement of any purchaser or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to GMC; (e) Merchant takes any action, fails to take any action, or offers any incentive— economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor. These protections are in addition to any other remedies available to GMC at law, in equity or otherwise pursuant to this Agreement; or (f) Merchant ceases to process credit card transactions for a period of 7 business days.

**Protection 1.** The full uncollected Purchase Amount plus all fees (including legal fees) due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2.** GMC may enforce the provisions of the Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** Merchant hereby authorizes GMC to execute in the name of the Merchant a Confession of Judgment in favor of GMC in the amount of Purchase Amount stated in the Agreement. Upon breach of any provision in this paragraph 1.11, GMC may enter this Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon. **Protection 4.** GMC may enforce its security interest in the Collateral identified in Article III hereof.

**Protection 5.** The entire Purchase Amount and all fees (including legal fees) shall become immediately refundable and payable to GMC from Merchant.

**Protection 6.** GMC may proceed to protect and enforce its rights and remedies by lawsuit. In any such lawsuit, under which GMC shall recover Judgment against Merchant, Merchant shall be liable for all of GMC's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7.** This Agreement shall be deemed Merchants Assignment of Merchant's Lease of Merchant's business premises to GMC. Upon breach of any provision in this Agreement, GMC may exercise its rights under this Assignment of Lease without prior Notice to Merchant. **Protection 8.** GMC may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to GMC.

**1.12 Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes GMC to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that GMC obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against GMC or any of its affiliates relating to any (i)investigation undertaken by or on behalf of GMC as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**1.13 Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by GMC, including this Agreement and any other GMC documentations (collectively, "Confidential Information") are proprietary and confidential information of GMC. Accordingly unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of GMC to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles GMC to not only damages and legal fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

**1.14 Publicity.** Merchant and each of Merchant's Owners and all Guarantors hereto all hereby authorizes GMC to use its, his or her name in listings of clients and in advertising and marketing materials.

**1.15 D/B/A's.** Merchant hereby acknowledges and agrees that GMC may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between GMC and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**1.16 Due Diligence.** Merchant authorizes GMC to conduct background, onsite and financial examinations of Merchant, which may include without limitation, address verifications for up to ten (10) years; verification of the status of the licenses, permits, authorizations and/or governmental filings of Merchant; verification of insurance coverage; verification of good business practices through the appropriate agencies; and a search for bankruptcies, liens or judgments in all jurisdictions where business functions have been conducted. Any onsite examination may include, without limitation, verification that business is conducted as represented by Merchant at all sites where it conducts business. This examination shall be conducted upon reasonable prior notice to the Merchant and only during reasonable business hours. The financial examination may include, without limitation, a review of Merchant's current financial statements; it's most recent annual reports, tax returns for the previous three (3) years, and all documentation supporting employee bond; and insurance policies of Merchant. If Merchant is not publicly held, GMC, or its agents, may conduct background and financial examinations of all principals owning ten percent (10%) or more of Merchant. Such examination may also include, without limitation, a review of information regarding criminal history for all jurisdictions where the Principal has resided and been employed, address verification for all residences, and employment verification. The examination may also include, without limitation, a review of the credit standing of the principal, and a search for bankruptcies and judgments in all jurisdictions where the principal has resided or been employed. The review may also include a review of up to three (3) years of personal tax returns.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement; and until GMC is fully paid:

**2.1 Financial Condition and Financial Information.** Merchant's and Guarantors' bank and financial Statements, copies of which have been furnished to GMC, and future statements which will be furnished hereafter at the discretion of GMC, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantors have a continuing, affirmative obligation to advise GMC of any material adverse change in their financial condition, operation or ownership. GMC may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to GMC within 5 business days. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**2.2 Governmental Approvals.** Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**2.3 Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**2.4 Insurance.** Merchant will maintain business-interruption insurance naming GMC as loss payee and additional insured in amounts and against risks as are satisfactory to GMC and shall provide GMC proof of such insurance upon request.

**2.5 Electronic Check Processing Agreement.** Merchant will not change its processing, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without GMC's prior written consent. Any such changes shall be a material breach of this Agreement.

**2.6 Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and GMC, nor shall Merchant change any of its places of business without prior written consent by GMC.

**2.7 Daily Batch Out.** Merchant will batch out receipts with the Processor on a daily basis.

**2.8 Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from GMC to Merchant, execute, acknowledge and deliver to GMC and/or to any other person, firm or corporation specified by GMC, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**2.9 No Bankruptcy.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. In the event that the Merchant files for bankruptcy protection or is placed under an involuntary filing Protections 2 and 3 are immediately invoked.

**2.10 Working Capital Funding.** Merchant shall not enter into any arrangement, agreement or commitment that relates to or involves the Receipts, whether in the form of a purchase of, a loan against, collateral against or the sale or purchase of credits against, Receipts or future check sales with any party other than GMC.

**2.11 Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of GMC.

**2.12 Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

**2.13 Defaults under Other Contracts.** Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

**2.14 Good Faith, Best Efforts and Due Diligence.** Merchant and Guarantors hereby affirm that it will conduct its business in Good Faith and will expend its Best Efforts to maintain and grow its business, to ensure that GMC obtains the Purchased Amount. Furthermore, Merchant and Guarantors hereby agree, warrant and represent hereby that they will constantly perform all appropriate Due Diligence and credit checks of all of the customers' finances, cash flow, solvency, good faith, payment histories and business reputations (the "Due Diligence Requirements") as may suffice to ensure any and all products and/or services provided, sold or delivered by Merchant to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account. These Due Diligence Requirements must be performed prior to any sales to any customer, and repeated no less frequently than monthly for so long as any sums are due from those customers. Full documentation of all of Merchant's compliance with its Due Diligence Requirements must be maintained in Merchant's files so long as GMC has not fully collected all sums due to it. This is not a guaranty of payment by customers, but is a guaranty of full, adequate and good faith Due Diligent

SINGAL_00006336

Gov. Ex. 214-002

investigation and credit check of customers before extending credit to them and continuing no less frequently than monthly so long as sums are still due. Merchant hereby further agrees to not induce, instruct, incentivize, or cause through any other means, their customers to pay the Merchant in cash rather than through the electronic methods mentioned herein.

## III. EVENTS OF DEFAULT AND REMEDIES

**3.1 Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) Merchant shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Merchant seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; (d) the sending of notice of termination by Merchant; (e) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (f) Merchant shall transfer or sell all or substantially all of its assets; (g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (h) Merchant shall use multiple depository accounts without the prior written consent of GMC (i) Merchant shall change its depositing account without the prior written consent of GMC; (j) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with GMC; (l) Merchant ceases to process credit card transactions for a period of 7 business days; (m) Merchant shall change its credit card processor(s) from one agreed to by GMC without the prior written consent of GMC; (n) Merchant permits any event to occur that could cause a diversion of any credit card transactions to a credit card processor other than one agreed to by GMC without the prior written consent of GMC; (o) GMC shall fail to have valid and unencumbered ownership in and to the Purchased Receivables; or (p) there is any material adverse change in the operations of Merchant, or any other event which materially affects the ability of Merchant to perform its obligations hereunder.

**3.2 Personal Guaranty.** In the event of a Default under Sections 2.3, 2.5, 2.6, 2.9, 2.10, 2.11, 2.12, 2.13, and 2.14 hereof, should GMC determine that the Purchased Amount cannot be obtained from the Merchant's business, GMC will enforce its rights against the Guarantors of this transaction. Said Guarantors will be jointly and severally liable to GMC for all of GMC's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

**3.3 Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4.1 hereof, GMC may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of GMC in connection with this Agreement may be exercised at any time by GMC after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**3.4 Costs.** Merchant shall pay to GMC all reasonable costs associated with (a) a breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(b) the enforcement of GMC 's remedies set forth in Section 4.2 above, including but not limited to court costs and attorneys' fees. Any payments under an indemnity claim pursuant to section 1.6 of this Article I, shall include all the foregoing costs and expenses, as well as interest thereon at the rate of 1.5% per month from the date the obligation is due to the Indemnified Party until the indemnity claim shall be paid.

**3.5 Required Notifications.** Merchant is required to give GMC written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give GMC seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## IV. MISCELLANEOUS

**4.1 Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by GMC.

**4.2 Assignment.** GMC may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

**4.3 Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to GMC shall become effective only upon receipt by GMC. Notices to Merchant shall become effective three days after mailing.

**4.4 Waiver Remedies.** No failure on the part of GMC to exercise, and no delay in exercising, any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**4.5 Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, GMC and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of GMC which consent may be withheld in GMC's sole discretion. GMC reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if GMC so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by GMC to transfer such proceeding to an Acceptable Forum.

**4.6 Survival of Representation, etc.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**4.7 Interpretation.** All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

**4.8 Severability.** In case any of the provision in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**4.9 Entire Agreement.** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and GMC and supersede all prior agreements and understandings relating to the subject matter hereof.

**4.12 Supremacy.** It is specifically acknowledged by Merchant/Seller that this Agreement is supplemental to, and in addition to, the Business Advance and Security Agreement executed by Merchant, as well as all other Agreements executed by the parties. In the event of any conflict in any of the terms of any of the Agreements, then, and in any such event, it shall be in the sole and absolute discretion of GMC to elect which of the provisions shall be enforceable for that event, and the conflicting provisions shall be deemed withdrawn for event.

**4.10 JURY TRIAL WAIVER.**
THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

**4.11 CLASS ACTION WAIVER.**
THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

**4.11 Facsimile Acceptance.** Facsimile signatures hereon shall be deemed acceptable for all purposes.

Initials: _SS_

SINGAL_00006337
Gov. Ex. 214-003

# BUSINESS ADVANCE AND SECURITY AGREEMENT

**1. INTRODUCTION.** This Business Advance and Security Agreement ("Agreement") governs your business advance ("Advance") from Global Merchant Cash INC read it and keep it for your reference. In this Agreement, the words "you," "your" and "Seller" means each individual or entity that signs this Agreement or on whose behalf this Agreement is signed. The word "Buyer" means Global Merchant Cash INC or its successor(s) and assign(s).

**2. EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement in New York. Seller understands and agrees that Buyer may postpone, without penalty, the disbursement of amounts to Seller until all required security interests have been perfected and Buyer has received all required personal guarantees or other documentation.

**3. AUTHORIZATION.** Seller agrees that the Advance made by Buyer to Seller shall be conclusively deemed to have been authorized by Seller and to have been made pursuant to a duly authorized request therefore on its behalf.

**4. ADVANCE FOR COMMERCIAL PURPOSES ONLY.** The proceeds of the requested Advance may be used for business purposes, and not for personal, family or household purposes. Seller understands that Seller's agreement not to use the Advance proceeds for personal, family or household purposes means that certain important duties imposed upon entities making advances for consumer purposes, and certain important rights conferred upon consumers, pursuant to federal or state law will not apply to the Advance or the Agreement. Seller also understands that Buyer will be unable to determine whether the Advance conforms to this section. Seller agrees that a breach by Seller of the provisions of this section will not affect Buyer's right to (i) enforce Seller's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the Advance is in fact obtained or (ii) use any remedy legally available to Buyer, even if that remedy would not have been available had the Advance been made for consumer purposes.

**5. DISBURSEMENT OF ADVANCE PROCEEDS.** If Seller applied and was approved for an Advance, Seller's Advance will be disbursed upon approval as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits).

**6. PROMISE TO PAY.** Seller agrees to pay Buyer the amount of the Advance shown in the accompanying Business Advance and Security Agreement Supplement in accordance with the payment schedule shown in the Business Advance and Security Agreement Supplement. Seller agrees to enroll in Buyer's Automatic Payment Plan and authorizes Buyer to collect required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits).

**7. ALTERNATIVE PAYMENT METHODS.** If Seller knows that for any reason Buyer will be unable to process a payment under Buyer's Automatic Payment Plan, then Seller must promptly mail or deliver a check to Buyer in the amount of the missed payment or, if offered, make the missed payment by any pay-by-phone or on-line service that Buyer may make available from time to time. If Seller elects to send payments on Seller's Account by postal mail, then Seller agrees to send such payments to Global Merchant Cash INC 130 William St 5th Floor, New York, NY 10038. All alternative payments must be made in good funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Seller understands and agrees that payments made at any other address than as specified by Buyer may result in a delay in processing and/or crediting. If Seller makes an alternative payment on Seller's Advance by mail or by any pay-by-phone or on-line service that Buyer makes available while Seller is enrolled in the Automatic Payment Plan, Buyer may treat such payment as an additional payment and continue to process Seller's scheduled Automatic Payment Plan payments or may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received.

**8. APPLICATION OF PAYMENTS.** Subject to applicable law, Buyer reserves the right to apply payments to Seller's Advance in any manner Buyer chooses in Buyer's sole discretion.

**9. POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Buyer can accept late, postdated or partial payments without losing any of Buyer's rights under this Agreement. (A postdated check is a check dated later than the day it was actually presented for payment.) Buyer is under no obligation to hold a postdated check and Buyer reserves the right to process every item presented as if dated the same date received by Buyer or Buyer's check processor unless Seller gives Buyer adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Seller may not hold Buyer liable for depositing any postdated check. **Seller agrees not to send Buyer partial payments marked "paid in full," "without recourse," or similar language. If Seller sends such a payment, Buyer may accept it without losing any of Buyer's rights under this Agreement. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be mailed or delivered to Global Merchant cash INC Client Service, 130 Williams St 5th Floor, New York, NY 10038, Attn: Director of Operations.**

**10. PREPAYMENT.** Seller may prepay Seller's Advance in whole by paying Buyer the sum total of the payments described in the payment schedule set forth in Seller's Business Advance and Security Agreement Supplement less the amount of any Advance payments made prior to such prepayment. Seller may not prepay Seller's Advance in part at any time.

**11. SECURITY INTEREST.** Seller hereby grants to Buyer, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of Seller to Buyer hereunder and also any and all other debts, liabilities and obligations of Seller to Buyer of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, whether or not such obligations are related to the Advance described in this Agreement, by class, or kind, or whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument, and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, all interest, other fees and expenses (all hereinafter called "Obligations"). The Collateral includes the following property that Seller now owns or shall acquire or create immediately upon the acquisition or creation thereof: (i) any and all amounts owing to Seller now or in the future from any merchant processor(s) processing charges made by customers of Seller via credit card or debit card transactions; and (ii) all other tangible and intangible personal property, including, but not limited to (a) inventory, (b) equipment,(c) investment property, including certificated and un- certificated securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (d) instruments, including promissory notes (e) chattel paper, including tangible chattel paper and electronic chattel paper, (f) documents, (g) letter of credit rights, (h) accounts, including health-care insurance receivables, (i) deposit accounts, (j) commercial tort claims, (k) general intangibles, including payment intangibles and software and (l) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code. The security interest Seller grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Buyer disclaims any security interest in household goods in which Buyer is forbidden by law from taking a security interest.

**12. PROTECTING THE SECURITY INTEREST.** Seller agrees that Buyer may file any financing statement, lien entry form or other document Buyer requires in order to perfect, amend or continue Buyer's security interest in the Collateral and Seller agrees to cooperate with Buyer as may be necessary to accomplish said filing and to do whatever Buyer deems necessary to protect Buyer's security interest in the Collateral.

**13. LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.** Unless Buyer has agreed otherwise in writing, Seller agrees and warrants that (i) all Collateral (or records of the Collateral in the case of accounts, chattel paper and general intangibles) shall be located at Seller's address as shown in the application, (ii) except for inventory sold or accounts collected in the ordinary course of Seller's business, Seller shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Seller has not already told Buyer about, (iv) Seller shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement and (v) Seller shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof. Seller shall defend Buyer's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Buyer, shall not be co-mingled with any other funds and shall immediately be delivered to Buyer. This requirement, however, does not constitute consent by Buyer to any such disposition.

**14. TAXES, ASSESSMENTS AND LIENS.** Seller will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral and provide evidence of such payments to Buyer upon request.

**15. INSURANCE.** Seller shall procure and maintain such insurance as Buyer may require with respect to the Collateral, in form, amounts and coverage reasonably acceptable to Buyer and issued by a company reasonably acceptable to Buyer naming Buyer as loss payee. If Seller at any time fails to obtain or maintain any insurance as required under this Agreement, Buyer may obtain such insurance as Buyer deems appropriate. Seller shall promptly notify Buyer of any loss of or damage to the Collateral.

**16. REPAIRS AND MAINTENANCE.** Seller agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Seller further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**17. INSPECTION OF COLLATERAL.** Buyer and Buyer's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**18. BUYER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Buyer's interest in the Collateral or if Seller fails to comply with any provision of this Agreement or any related documents, including but not limited to Seller's failure to discharge or pay when due any amounts Seller is required to discharge or pay under this Agreement or any related documents, Buyer on Seller's behalf may (but shall not be obligated to) take any action that Buyer deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Buyer's option, will: (i) be payable on demand; (ii) be added to the balance of the Advance and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Advance; or (iii) be treated as a balloon payment that will be due and payable at the Advance's maturity. Such right shall be in addition to all other rights and remedies to which Buyer may be entitled upon an Event of Default.

**19. SELLER'S REPRESENTATIONS AND WARRANTIES.** Seller represents and warrants that: (i) Seller will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Seller's business and promises to hold Buyer harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Seller's principal executive office and the office where Seller keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Seller is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become

GMC ACH MA 102110

licensed could have a material adverse effect on the financial condition, business or operations of Seller; (iv) the exact legal name of the Seller is set forth in the application; (v) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Seller's powers, have been duly authorized, are not in contravention of law or the terms of Seller's charter, by-laws or other organization papers, or of any indenture, agreement or undertaking to which Seller is a party; (vi) all organization papers and all amendments thereto of Seller have been duly filed and are in proper order and any capital stock issued by Seller and outstanding was and is properly issued and all books and records of Seller are accurate and up to date and will be so maintained; (vii) Seller (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its organization documents and by-laws, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of the Collateral; and (viii) there is no action, suit, proceeding or investigation pending or, to Seller's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral.

**20. FEES.** In addition to any other fees described in the Agreement, Seller agrees to pay the following fees:

A. Origination Fee: A one-time Origination Fee in the amount set forth in the accompanying Business Advance and Security Agreement Supplement. Seller agrees that this fee will be immediately deducted from the proceeds of Seller's Advance.

B. Returned Payment Charge: A Returned Payment Charge in the amount set forth in the accompanying Business Advance and Security Agreement Supplement if any electronic payment processed on Seller's Advance is returned unpaid or dishonored for any reason.

C. Late Charge: A Late Charge in the amount set forth in the accompanying Business Advance and Security Agreement Supplement if a scheduled payment is not received by Buyer as provided in the payment schedule set forth in the Business Advance and Security Agreement Supplement.

**21. INTEREST AND FEE REFUNDS.** If the Advance is subject to a law that sets maximum charges, and that law is finally interpreted so that the interest or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) any sums already collected from Seller that exceed the permitted limits will be refunded or credited to Seller.

**23. FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.**
Seller and each guarantor (if any) authorize Buyer to obtain business and personal credit bureau reports in Seller's and any guarantor's name, respectively, at any time and from time to time for purposes of deciding whether to approve the requested Advance or for any update, renewal, extension of credit or other lawful purpose. Upon Seller's or any guarantor's request, Buyer will advise Seller or guarantor if Buyer obtained a credit report and Buyer will give Seller or guarantor the credit bureau's name and address. Seller and each guarantor (if any) agree to submit current financial information, a new credit application, or both, in Seller's name and in the name of each guarantor, respectively, at any time promptly upon Buyer's request. Seller authorizes Buyer to act as Seller's agent for purposes of accessing and retrieving transaction history information regarding Seller from Seller's designated merchant processor(s). Buyer may report Buyer's credit experiences with Seller and any guarantor of Seller's Advance to third parties as permitted by law. Seller also agrees that Buyer may release information to comply with governmental reporting or legal process that Buyer believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Seller is hereby notified that a negative credit report reflecting on Seller's credit record may be submitted to a credit reporting agency if Seller fails to fulfill the terms of Seller's credit obligations hereunder.

**24. ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Seller shall pay to Buyer on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Buyer to obtain or enforce payment of Obligations either as against Seller or any guarantor or surety of Seller or in the prosecution or defense of any action or concerning any matter growing out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Buyer's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Buyer in connection with the administration, supervision, protection or realization on any security held by Buyer for the debt secured hereby, whether such security was granted by Seller or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Buyer in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Buyer in connection therewith, which amounts shall be considered advances to protect Buyer's security, and shall be secured hereby.

**25. SELLER'S REPORTS.** Promptly upon Buyer's written request, Seller and each guarantor agrees to provide Buyer with such information about the financial condition and operations of Seller or any guarantor, as Buyer may, from time to time, reasonably request. Seller also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to provide notice thereof to Buyer in writing.

**26. INDEMNIFICATION.** Except for Buyer's gross negligence or willful misconduct, Seller will indemnify and save Buyer harmless from all loss, costs, damage, liability or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Buyer may sustain or incur by reason of defending or protecting Buyer's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter growing out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. This indemnity shall survive the repayment of the Obligations and the termination of this Agreement.

**27. MERGERS, CONSOLIDATIONS OR SALES.** Seller represents and agrees that Seller will not (i) merge or consolidate with or into any other business entity or (ii) enter into any joint venture or partnership with any person, firm or corporation.

**28. CHANGE IN LEGAL STATUS.** Seller represents and agrees that Seller will not (i) change its name, its place of business or, if more than one, chief executive office, or its mailing address or organizational identification number if it has one, or (ii) change its type of organization, jurisdiction of organization or other legal structure. If Seller does not have an organizational identification number and later obtains one, Seller shall forthwith notify Buyer of such organizational identification number.

**29. DEFAULT.** To the extent not prohibited by applicable law, the occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Buyer and Seller and instruments and papers given Buyer by Seller, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Buyer is unable to collect any Automatic Payment Plan payment on three consecutive dates due and/or, Seller fails to pay any Obligations on three consecutive dates due; (ii) Seller fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Buyer that any representation or warranty heretofore, now or hereafter made by Seller to Buyer, in any documents, instrument, agreement, or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Seller from any Buyer other than Buyer could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9-102 of the Uniform Commercial Code, to take priority over the Advance made by Buyer; (vi) a filing against or relating to Seller of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any agreement between Buyer and Seller or instrument or paper given Buyer by Seller, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Buyer may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Seller, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Seller's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Seller, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Seller; (x) the failure by Seller to generally pay the debts of Seller as they mature; (xi) adjudication of bankruptcy or insolvency relative to Seller; (xii) the entry of an order for relief or similar order with respect to Seller in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Seller initiating any matter in which Seller is or may be granted any relief from the debts of Seller pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Seller; (xv) the meeting by Seller with a formal or informal creditor's committee; (xvi) the offering by or entering into by Seller of any composition extension or any other arrangement seeking relief or extension for the debts of Seller, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Seller that seeks or intends to accomplish a reorganization or arrangement with creditors; (xvii) the entry of any judgment against Seller, which judgment is not satisfied or appealed from (with execution or similar process stayed) within 15 days of its entry; (xviii) the occurrence of any event or circumstance with respect to Seller such that Buyer shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Seller under this Agreement or any other agreement between Buyer and Seller is impaired or there shall occur any material adverse change in the business or financial condition of Seller; (xix) the entry of any court order that enjoins, restrains or in any way prevents Seller from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Seller; (xxi) any act by or against, or relating to Seller or its assets pursuant to which any creditor of Seller seeks to reclaim or repossess or reclaims or repossesses all or a portion of Seller's assets; (xxii) the termination of existence, dissolution or liquidation of Seller or the ceasing to carry on actively any substantial part of Seller's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Seller or any guarantor of Seller denies it has any further liability or obligation hereunder; (xxiv) any guarantor or person signing a support agreement in favor of Buyer shall repudiate, purport to revoke or fail to perform his or her obligations under his guaranty or support agreement in favor of Buyer or any corporate guarantor shall cease to exist; (xxv) any material change occurs in Seller's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) Seller dies; if Seller is a sole proprietorship, the owner dies; if Seller is a trust, any trust or dies; if Seller is a partnership, any general or managing partner dies; if Seller is a corporation, any principal officer or 10% or greater shareholder dies; if Seller is a limited liability company, any managing member dies; if Seller is any other form of business entity, any person(s) directly or indirectly controlling 10% or more of the ownership interests of such entity dies.

**30. RIGHTS AND REMEDIES UPON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Buyer may exercise any one or more of the following rights and remedies:

A. Accelerate Indebtedness: Buyer may declare the entire Obligations immediately due and payable, without notice of any kind to Seller.

B. Assemble Collateral: Buyer may require Seller to deliver to Buyer all or any portion of the Collateral and any and all certificates of title and other documents relating to the

GMC ACH MA 102110

SINGAL_00006339
Gov. Ex. 214-005

Collateral. Buyer may require Seller to assemble the Collateral and make it available to Buyer at a place to be designated by Buyer. Buyer also shall have full power to enter, provided Buyer does so without a breach of the peace or a trespass, upon the property of Seller to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Seller agrees Buyer may take such other goods, provided that Buyer makes reasonable efforts to return them to Seller after repossession.

C. <u>Sell the Collateral:</u> Buyer shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Buyer's own name or that of Seller. Buyer may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Buyer will give Seller, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least 10 days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Buyer's option, will: (i) be payable on demand; (ii) be added to the balance of the Advance and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Advance; or(iii) be treated as a balloon payment that will be due and payable at the Advance's maturity.

D. <u>Appoint Receiver:</u> Buyer shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The receiver may serve without bond if permitted by law. Buyer's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Buyer shall not disqualify a person from serving as a receiver.

E. <u>Collect Revenues, Apply Accounts:</u> Buyer, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Buyer may at any time in Buyer's discretion transfer any Collateral into Buyer's own name or that of Buyer's nominee and receive the payments, rents, income and revenues there from and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Buyer may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, chooses in action, or similar property, Buyer may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Buyer may determine, whether or not any amount included within the Obligations is then due. For these purposes, Buyer may, on behalf of and in the name of Seller, receive, open and dispose of mail addressed to Seller; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Buyer may notify account debtors and obligors on any Collateral to make payments directly to Buyer.

F. <u>Obtain Deficiency:</u> If Buyer chooses to sell any or all of the Collateral, Buyer may obtain a judgment against Seller for any deficiency remaining on the Obligations due to Buyer after application of all amounts received from the exercise of the rights provided in this Agreement. Seller shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

G. <u>Other Rights and Remedies:</u> Buyer shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Buyer shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

H. <u>Election of Remedies:</u> Except as may be prohibited by applicable law, all of Buyer's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Buyer to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Seller under the Agreement, after Seller's failure to perform, shall not affect Buyer's right to declare a default and exercise its remedies.

**31. CONSENT TO JURISDICTION AND VENUE.** Seller and Buyer agree that any action or proceeding to enforce or arising out of this Agreement may be commenced in any court of the State of New York or in the United States District Court for the District of New York, and Seller waives personal service of process and agrees that a summons and complaint commencing an action or proceeding in any such court shall be properly served and confer personal jurisdiction if served by registered or certified mail to Seller, or as otherwise provided by the laws of the State of New York or the United States of America. Seller and Buyer agree that venue is proper in such courts.

**32. NO WAIVER BY BUYER.** No delay or omission on the part of Buyer in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Buyer's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

GMC ACH MA 102110

**33. ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Seller may not assign this Agreement or any rights or duties hereunder without Buyer's prior written consent and any prohibited assignment shall be absolutely void. No consent to an assignment by Buyer shall release Seller from its Obligations. Buyer may assign this Agreement and its rights and duties hereunder and no consent or approval by Seller is required in connection with any such assignment. Buyer reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Buyer's rights and benefits hereunder. In connection with any assignment or participation, Buyer may disclose all documents and information that Buyer now or hereafter may have relating to Seller or Seller's business. To the extent that Buyer assigns its rights and obligations hereunder to another party, Buyer thereafter shall be released from such assigned obligations to Seller and such assignment shall affect a novation between Seller and such other party.

**34. INTERPRETATION.** Paragraph and section headings used in this Agreement are for convenience only, and shall not effect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Buyer or Seller, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**35. SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**36. NOTICES.** Except as otherwise provided in this Agreement; notice under this Agreement must be in writing. Notices will be deemed given when deposited in the U.S. mail, postage prepaid, and first class mail; when delivered in person; or when sent by registered mail; by certified mail; or by nationally recognized overnight courier. Notice to Seller will be sent to Seller's last known address in Buyer's records for this Advance. Notice to Buyer may be sent to: Global Merchant Cash 130 Williams St. 5th floor New York, NY 10038.

**37. RECORDKEEPING REQUIREMENTS.** Buyer shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Buyer by Seller in connection with this Agreement or any other agreement for more than four months after receipt of the same by Buyer. Seller will at all times keep accurate and complete records of Seller's accounts and Collateral. At Buyer's request, Seller shall deliver to Buyer: (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral as Buyer shall request. Buyer, or any of its agents, shall have the right to call at Seller's place or places of business at intervals to be determined by Buyer, and without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Seller's accounts and Collateral or other transactions between the parties thereto and the general financial condition of Seller and Buyer may remove any of such records temporarily for the purpose of having copies made thereof.

**38. GOVERNING LAW.** Our relationship [including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement] is governed by, and this Agreement will be construed in accordance with, applicable federal law and (to the extent not preempted by federal law) New York law without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws. Seller understands and agrees that (i) Buyer is located in New York, (ii) Buyer makes all credit decisions from Buyer's office in New York, (iii) the Advance is made in New York (that is, no binding contract will be formed until Buyer receives and accepts Seller's signed Agreement in New York) and (iv) Seller's payments are not accepted until received by Buyer in New York.

**39. WAIVER OF NOTICES AND OTHER TERMS.** Except for any notices provided for in this Agreement, Seller and any person who has obligations pursuant to this Agreement (e.g., a guarantor), to the extent not prohibited by applicable law hereby, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent permitted by applicable law, Seller and any person who has obligations pursuant to this Agreement also agree: Buyer is not required to file suit, show diligence in collection against Seller or any person who has obligations pursuant to this Agreement, or proceed against any Collateral; Buyer may, but will not be obligated to, substitute, exchange or release any Collateral; Buyer may release any Collateral, or fail to realize upon or perfect Buyer's security interest in any Collateral; Buyer may, but will not be obligated to, sue one or more persons without joining or suing others; and Buyer may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made).

**40. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.**
In order to ensure a high quality of service for Buyer's customers, Buyer may monitor and/or record telephone calls between Seller and Buyer's employees. Seller acknowledges that Buyer may do so and agrees in advance to any such monitoring or recording of telephone calls. Seller also agrees that Buyer may communicate with Seller electronically by e-mail

**41. JURY TRIAL WAIVER.** To the extent not prohibited by applicable law, Seller and Buyer waive their right to a trial by jury of any claim or cause of action based upon, arising out of or related to the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Any such claim or cause of action shall be tried by court sitting without a jury.

Initials: _44_

SINGAL_00006340
Gov. Ex. 214-006